■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JASON SCOTCHMER, Appellant. [727 NYS2d 777] —Spain, J. Appeal from a judgment of the County Court of Chemung County (Buckley, J.), rendered April 24, 2000, convicting defendant upon his plea of guilty of two counts of the crime of murder in the first degree.

After defendant's motion to suppress his statements to police was denied, defendant entered a plea of guilty to two counts of intentional murder in the first degree (Penal Law § 125.27 [1] [a] [viii][1]) for his admitted conduct on August 6, 1999 in shooting at close range and in rapid succession his mother, Kathleen Scotchmer, and her boyfriend, Ronald Brewer. The comprehensive plea colloquy established that the shootings occurred at the victims' home in the Town of Horseheads, Chemung County, where defendant also resided, after a verbal confrontation between defendant and his mother. The plea was in full satisfaction of an indictment which also charged two counts of intentional murder in the second degree. Pursuant to the negotiated plea agreement, defendant was sentenced to two concurrent prison terms of 25 years to life. Defendant appeals, challenging County Court's ruling denying suppression of his statements to police and arguing that the sentence imposed is harsh and excessive.

We affirm. The undisputed evidence adduced at the *Huntley* hearing is that at approximately 4:45 P.M. on August 6, 1999, defendant entered the Horseheads Police Station and asked to speak with a police officer; when an officer came out to the waiting area and asked "if [he] could help him," defendant immediately held up both arms together in front of himself and stated: "arrest me, I just killed my mother and her boyfriend." The officer asked "What?," to which defendant replied that he had just shot his mother and her boyfriend at a specific address, which he provided. Defendant continued to hold his arms

---

1. Penal Law § 125.27 (1) (a) (viii) provides that
   "[a] person is guilty of murder in the first degree when:
   "1. With intent to cause the death of another person, he causes the death of such person or of a third person; and * * *
   "(viii) as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction."

out and, for safety reasons, the officer placed handcuffs on him but did not formally arrest him and brought him into a report room; the officer directed the dispatcher to call the State Police—who had jurisdiction over the address—as well as the police department sergeant on duty. About three minutes later, at the request of the State Police who were responding to the address, the officer asked defendant where the weapon was; defendant responded that he was not sure, that it was either in the living room or in the bedroom.

The sergeant arrived at the station in a matter of minutes, was quickly briefed by the officer and, since he was at that point unaware of any reported shootings in the area, inquired of defendant what had happened. Defendant repeated that he had shot and killed his mother and her boyfriend at their residence, first shooting the boyfriend, and then his mother in the kitchen, and then returning to shoot the boyfriend again upon hearing him moaning. The sergeant then overheard the fire department being dispatched to the residence for a medical emergency and learned from the State Police that there were probably people injured or dead at that residence, at which point—approximately 5:00 P.M.—he advised defendant of his *Miranda* rights. Defendant was coherent, spoke clearly, and indicated that he understood his rights and would talk to police, but never requested an attorney or that the questioning cease.

Thereafter, an investigator with the State Police Bureau of Criminal Investigations arrived at approximately 5:10 P.M. and was informed that defendant had received *Miranda* warnings. When the investigator told defendant to relax and that "everything will be okay," defendant stated that "it's hard to relax when you just murdered someone." Defendant was transported to the State Police barracks, arriving about 5:30 P.M., and was again advised of his *Miranda* rights. He provided a written statement, admitting that he intentionally shot the victims intending to kill them, which was completed at 7:43 P.M.

County Court correctly determined that defendant's volunteered statements to the officer at defendant's self-initiated appearance at the police station were clearly spontaneous and not in response to any police questioning or the product of police interrogation, the police having at that time no reports or knowledge of any shootings or disturbances at the residence or criminal activity involving defendant (*see, People v Burnett*, 228 AD2d 788, 790; *People v Brewer*, 136 AD2d 831, *lv denied* 71 NY2d 966). In our view, the officer's understandable

follow-up inquiry—"What?"—was noncustodial, noninterrogational and simply a spontaneous threshold query designed to immediately clarify the uncertain situation rather than to elicit further incriminating statements (see, id.; see also, People v Huffman, 41 NY2d 29, 34). Further, defendant was technically in custody when, at his request, he was thereafter handcuffed in front, as his hands were offered (see, People v Yukl, 25 NY2d 585, 589), whereas procedure dictated that persons be handcuffed in back; however, the single question concerning the location of the weapon was appropriately aimed at protecting the public, the victims and the responding State Troopers and was not intended to obtain incriminating evidence (see, People v Sanchez, 255 AD2d 614, 615, lv denied 92 NY2d 1053; People v Oquendo, 252 AD2d 312, lv denied 93 NY2d 901; People v Clark, 198 AD2d 46, lv denied 83 NY2d 870; People v Melvin, 188 AD2d 555, 556, lv denied 81 NY2d 889; People v Chatman, 122 AD2d 148; see also, New York v Quarles, 467 US 649; cf., People v Strickland, 169 AD2d 9).

Likewise, the police sergeant's brief inquiry of defendant upon arriving at the station—as to what had happened—was designed to immediately clarify the nature of the situation that he was confronting and to ascertain appropriate responsive action rather than to coerce or cajole additional incriminating statements (see, People v Huffman, supra, at 32-34; People v Brewer, supra). As County Court noted, the sergeant advised defendant of his Miranda rights as soon as there was reason to believe that there was some basis to defendant's statements. Thus, the court correctly determined that defendant's pre-Miranda statements were admissible.

Finally, we find no error in County Court's ruling that defendant's post-Miranda, custodial statements to the State Police Investigator were admissible. Defendant's spontaneous incriminating statement at the police station, when encouraged to relax by the investigator who had just arrived, was not the product of police questioning (see, People v Burnett, supra). Further, defendant declined several offers to remove the cuffs at the State Police barracks, at one point indicating that he was afraid of what he might do if they were removed; he received Miranda warnings a second time, indicated that he understood and signed a waiver, agreed to provide a written statement and was offered nourishment. We find no basis for defendant's contentions that his post-Miranda statements to the investigator at the police station or his subsequent written or oral statements were involuntary or otherwise inadmissible.

With regard to the sentence imposed, defendant argues that

it should be reduced in the interest of justice in view of his ·cooperation and admission of guilt, his youth (age 21 at the time of the crimes), lack of any prior criminal or juvenile record, and his documented history of abuse, neglect, mental disabilities and limitations. The plea colloquy reveals, however, that defendant was aware of the potential prison sentences of 25 years to life, which are far less than the maximum authorized sentence in this case[2] for first degree murder, i.e., life without parole (see, Penal Law §§ 60.06, 70.00 [5]; see also, CPL 400.27 [1]), the minimum sentence being 20 years to life (see, Penal Law § 70.00 [2], [3]). County Court expressly and at length took into consideration the many mitigating factors, including defendant's extensive involvement with child protective services and Family Court, his five-year placement in foster care during his teen years, his educational background and his harmful home environment as a child in which he was subjected to domestic violence, substance abuse and significant physical and verbal abuse and neglect. However, the negotiated, concurrent and less than maximum sentences imposed for this truly tragic double-murder reflect a rational and balanced judgment as to the appropriate sentence and take into consideration the compelling mitigating factors. Discerning no abuse of discretion or extraordinary circumstances warranting a reduction in this sentence, we affirm (see, People v Dolphy, 257 AD2d 681, 685, lv denied 93 NY2d 872).

Cardona, P. J., Mercure, Crew III and Carpinello, JJ., concur. Ordered that the judgment is affirmed.

---

**2.** The People declined to serve a notice of intent to seek the death penalty and, accordingly, that sentence was not available (see, CPL 250.40, 400.27 [1]).