In the Matter of JOHN C., Appellant.

Second Department, September 8, 1987

---

## APPEARANCES OF COUNSEL

*Lenore Gittis (Dustin P. Ordway* of counsel), for appellant.

*Peter L. Zimroth,* Corporation Counsel (*Stephen J. McGrath* and *Lin B. Saberski* of counsel), for respondent.

### OPINION OF THE COURT

BROWN, J.

On this appeal we are asked to determine whether the Family Court properly applied the *Miranda* rule's "public safety" exception *(see, New York v Quarles,* 467 US 649, 653; *Miranda v Arizona,* 384 US 436) in denying the appellant's motion to suppress certain statements made to the arresting officer concerning the location of the gun used in the underlying incident. We conclude that the court erred in applying the exception and, accordingly, reverse the final order of adjudication and disposition, suppress the statements in issue, and remit the matter for further proceedings.

The appellant, John C., who was 11 years old at the time of his arrest, was charged in a juvenile delinquency petition with committing a number of acts which, if committed by an adult, would have constituted, *inter alia,* the crimes of attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), attempted manslaughter in the first degree (Penal Law §§ 110.00, 125.20 [1]), assault in the first degree, assault in the second degree (Penal Law § 120.10 [1], [3]; § 120.05 [1], [2], [4]) and reckless endangerment in the first degree (Penal Law § 120.25). The charges arose out of an incident which occurred on February 3, 1986, during which the appellant is alleged to have shot a 14-year-old youth in the back.

Appellant moved to suppress certain statements made by him to one of the arresting officers on the grounds that they were obtained without *Miranda* warnings and in violation of Family Court Act § 305.2.

At the suppression hearing, Police Officer Erwin Valle testified that on the day in question he and his partner responded to a radio report of a youth having been shot in apartment 5E at 108-09 159th Street in Jamaica. When the officers arrived at the location, Officer Valle was led by a youth into a bedroom where he saw another youth, the complainant, lying face down on the floor with a blood stain on his shirt. After the officer radioed for an ambulance, a woman entered the bedroom with another youth, the appellant. The officer brought the appellant to where the complainant was lying and asked the complainant if it was the appellant who had shot him. The complainant responded affirma-

tively. At that point, the officer stated that he "investigated the incident of what happened by asking [the appellant] 'Why did you shoot him and where is the gun?' " to which the appellant responded "I took the cartridge out. I didn't know the gun was loaded. I didn't mean to shoot my friend. I don't have it".

The officer testified further that he then placed the appellant under arrest and took him to the living room where he continued to question him with respect to the location of the gun because he was fearful for the safety of the children who were in the house. When the officer asked the appellant a second time where the gun was located, the appellant, according to the officer's testimony, stated "I don't have it". The officer testified further that he persisted in asking the appellant where the gun was located and told him "There's something serious that you have done here. Please tell us—tell me where the gun is". The appellant then, the officer stated, told him that he had given the gun to a friend named Steve who lived across the street. When an investigation revealed that the appellant had provided a false name, Officer Valle again confronted the appellant, who then gave the friend's correct name. After ascertaining that the appellant's friend did in fact live across the street, the officer testified that he then asked the appellant why he had given the gun to his friend and the appellant responded that he had held the gun for his friend who sells cocaine.

The officer testified further that he and his partner thereafter took the appellant to the police precinct where, for the first time in the Youth Holding Room, he was given his *Miranda* warnings in the presence of his aunt and legal guardian, Jeanette C. The appellant stated at that time that he did not want to answer any further questions. Later, while the appellant was being questioned by Officer Valle and his partner as to pedigree information, he made a further statement, which is not at issue on this appeal.

The only other witness at the hearing was the appellant's aunt, who testified that she estimated that there were about eight uniformed officers and six plain-clothes detectives in the apartment, and that about one half of the uniformed officers and 2 or 3 of the detectives questioned the appellant in the apartment during the nearly one-hour period prior to his being taken to the police precinct. The aunt testified that at no time during this period was the appellant permitted to be alone with her.

The hearing court in its decision divided the appellant's comments into four groups and ruled upon them separately. The court ruled that the first statement, which consisted of the appellant's response to the question as to why he had shot the complainant, was the product of custodial interrogation, and, since it was not preceded by *Miranda* warnings, was inadmissible at the fact-finding hearing. The court ruled that the second statement—which in fact consisted of the appellant's responses to three separate inquiries as to where the gun was located—although also the product of a custodial interrogation, fell within the purview of the public safety exception to the *Miranda* rule as set forth in *New York v Quarles* (467 US 649, *supra*). The court ruled further that the third statement, consisting of the appellant's response to the inquiry as to why he had given the weapon to his friend, was not necessitated by any concern for the public safety and thus was inadmissible. Finally, the court found that the appellant's fourth statement made at the police precinct during processing was a spontaneous outburst not the product of police interrogation and was therefore admissible. As previously indicated, however, this latter statement is not at issue on this appeal.

Following the court's partially unfavorable ruling on his suppression motion, the appellant admitted to committing acts which, if committed by an adult, would have constituted the crime of reckless endangerment in the first degree. He was thereafter adjudicated a juvenile delinquent and placed with the Division of Youth, Title III, for a period of 18 months.

On this appeal, appellant argues that the court erred in refusing to suppress his statement made in response to the officer's questioning as to the location of the gun. He contends that no exigent circumstances existed which would warrant the application of the public safety exception to the *Miranda* rule which was recognized by the Supreme Court in *New York v Quarles (supra)*. We agree.

It is axiomatic that custodial interrogation of an individual which is not preceded by warnings as to the rights he is foregoing and a waiver thereof will be deemed violative of the Fifth Amendment guarantee against self-incrimination *(Miranda v Arizona,* 384 US 436, *supra)*. In *New York v Quarles (supra),* however, the Supreme Court carved out a narrow exception to the *Miranda* rule which is best explained by examining the facts of that case. In *Quarles,* two police officers

on patrol were stopped by a woman who told them that she had just been raped by a man and that he had just entered a nearby supermarket and was carrying a gun. One of the officers entered the supermarket and, near the checkout counter, spotted an individual meeting the description of the suspect provided by the woman. When the man fled toward the rear of the store, the officer pursued him with a drawn gun and then, after losing sight of him for several seconds, ordered him to stop. Upon frisking the suspect, the officer discovered that he was wearing an empty shoulder holster. After handcuffing him, the officer asked him where the gun was. The suspect responded by nodding toward some empty cartons and stating "the gun is over there". After retrieving the weapon, the officer formally placed the defendant under arrest and read him his *Miranda* rights. When the defendant indicated his willingness to answer questions without an attorney being present, the officer proceeded to question him as to the ownership of the gun and where it had been obtained by him. In a subsequent prosecution of the defendant on weapons charges, the suppression court excluded the defendant's statement that "the gun is over there" on the ground that it had been obtained in the absence of *Miranda* warnings and excluded his answers to the ensuing questions as to ownership and place of purchase on the ground that they were tainted by the prior improperly obtained statements. This court affirmed *(People v Quarles,* 85 AD2d 936) as did a divided Court of Appeals *(People v Quarles,* 58 NY2d 664).

In reversing and remitting the case, the United States Supreme Court created a so-called "public safety" exception to the *Miranda* rule. In several previous cases, the Supreme Court had pointed out that *Miranda* warnings are not constitutional rights in and of themselves, but rather are prophylactic measures to insure protection of the right against self-incrimination during custodial interrogation *(see, Edwards v Arizona,* 451 US 477; *Michigan v Tucker,* 417 US 433). In *Quarles,* it was clear that the defendant was in custody at the time he made the statement in question and thus *Miranda* was applicable. It was also clear that since, at the time the defendant was questioned, he was handcuffed and surrounded by at least four police officers, there was nothing to suggest that the officers were concerned for their own safety *(New York v Quarles, supra,* at 665).

Starting from this point, the Supreme Court reasoned that, absent a claim that the statement was compelled by police

conduct, "the only issue [was] whether [the police officer] was justified in failing to make available * * * the procedural safeguards associated with the privilege against * * * self-incrimination since *Miranda" (New York v Quarles, supra,* at 654-655). The court went on to hold that on the facts before it, a public safety exception to the requirement for *Miranda* warnings existed. This exception, it ruled, was one which applied regardless of the motivation of the individual officers involved.

Noting the myriad of motives which might simultaneously prompt a police officer's actions in such a spontaneous situation, including his own safety and the safety of others—as well as a desire to obtain incriminating evidence—the court declined to rest the exception upon an examination of the subjective intentions of an arresting officer *(New York v Quarles, supra,* at 656). Rather, the court predicated the exception upon a balancing between a police officer's need to ask questions reasonably prompted by a concern for public safety and the prophylactic rule protecting an individual's privilege against self-incrimination *(New York v Quarles, supra,* at 657).

Responding to a contention by dissenting Justice Marshall (with whom Justices Brennan and Stevens concurred) that such an exception would unnecessarily detract from the clarity of the *Miranda* rule, the court acknowledged some lessening of that clarity, but noted: "As we have in other contexts, we recognize here the importance of a workable rule 'to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' *Dunaway* v. *New York,* 442 U.S. 200, 213-214 (1979). But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect" *(New York v Quarles, supra,* at 658-659). Upon review of the facts before us, however, we cannot conclude that Officer Valle was presented with the type of immediate volatile situation which the Supreme Court has reasoned justifies the application of the public safety exception.

There is no question but that guns left unattended in public areas present a danger to the public. Indeed, in any case involving the use of a weapon, there is always a possibility that the weapon, if not found on the person of the suspect, may be located somewhere in the vicinity and pose a potential danger to the public. If inquiry as to the location of weapons were permitted in every case without the police being required to first give *Miranda* warnings, the exception would overcome the rule and inquiries as to the location of weapons would never be subject to the strictures of the *Miranda* rule. We do not believe that the Supreme Court in *Quarles (supra)* intended the exception to be applied so broadly. Rather, as an exception to the general rule, a more narrow construction is in order.

Where, then, is the line to be drawn between the right of inquiry as to the location of weapons for purposes of public safety and inquiry which is designed to further the investigation into the crime? A close analysis of the *Quarles* decision (467 US 649, *supra)* reveals guideposts to determine whether the police conduct falls within the exception or the rule.

One distinction between the instant case and *Quarles (supra)* is that while *Quarles* concerned the possible concealment of a weapon in a public area, the instant case involved a private residence. We do not, however, see this as being a particularly meaningful distinction. While, obviously, concealment of a gun in a widely used, large public area such as a supermarket creates a greater potential for danger to a member of the general public, the presence of a weapon also may pose a substantial threat to a number of people, including an arresting officer, when it is located in or about a private residence. Thus, in the past, we have applied the *Quarles* exception in instances involving inquiries concerning weapons found within and in the immediate vicinity of private residences *(see, People v Chatman,* 122 AD2d 148; *People v Waiters,* 121 AD2d 414, *lv denied* 68 NY2d 760). Although the *Quarles* case dealt with a large public area, we do not perceive that the Supreme Court intended its reasoning to apply only to such locations.

More pertinent, however, are the characterizations used by the court to describe the nature of the situations which require the creation of the exception. Thus, the court spoke of "a kaleidoscopic situation * * * where spontaneity rather than adherence to a police manual is necessarily the order of

the day" *(New York v Quarles, supra,* at 656); of situations where a police officer "would act out of a host of different, instinctive, and largely unverifiable motives" *(New York v Quarles, supra,* at 656); and of declining: "to place officers * * * in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them" *(New York v Quarles, supra,* at 657-658). Addressing the facts of the *Quarles* case itself, the court noted that the police were in the very act of apprehending the suspect and were faced with the immediate need of ascertaining the whereabouts of a gun which they had every reason to believe had just been removed from a holster and discarded in the supermarket where it posed a danger either through the use a possible accomplice might make of it or through its later discovery by a customer or employee *(New York v Quarles, supra,* at 657). Similar situations presented themselves in both the *Chatman* and *Waiters* cases *(supra)* which were decided by this court, where the arresting officers arrived in the midst of volatile situations and made brief immediate inquiries which were apparently more for the purpose of clarifying the situation and ascertaining for safety reasons the location of possible weapons, than to secure evidence of a crime *(see, People v Johnson,* 59 NY2d 1014; *People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v Huffman,* 41 NY2d 29).

By contrast, the facts at bar do not support a finding of a similarly volatile situation contemplated by *Quarles (supra)* requiring the type of immediate inquiry by the police to defuse a potential threat to the public safety. Officer Valle's own testimony reveals that once the appellant was brought into the bedroom and identified as the shooter, he began his investigation. It bears noting also that the officer's first question was not as to the whereabouts of the gun but a request for an incriminating statement, prior to any admission of guilt by the appellant. While the suppression court separated the two initial inquiries and coupled the latter inquiry as to the location of the gun with the later similar inquiries, it appears more likely that the two initial questions were joined together

for the purpose of commencing what the officer himself termed his investigation rather than out of any safety concerns.

This conclusion is borne out by the manner in which events thereafter evolved. Officer Valle's continued questioning of the appellant as to the location of the gun occurred only after he formally placed the appellant under arrest and removed him to the living room. The questioning was even interrupted on two occasions while Valle investigated the residence of the friend who allegedly had the weapon. In fact, the appellant remained in the apartment, being questioned intermittently, for close to one hour before being taken to the precinct. It also bears noting that within minutes after Officer Valle and his partner arrived, the apartment had been secured by upwards of 14 police officers. Under these circumstances, we cannot conclude that there existed the type of volatile situation calling for immediate action upon which the Supreme Court predicated the narrow public safety exception to the *Miranda* rule. There were no exigent circumstances here which could justify the police in continually questioning the appellant for close to an hour without advising him and his aunt of his *Miranda* rights. While, certainly, the police were justified in attempting to ascertain the whereabouts of the weapon involved in the shooting, their inquiries here were based upon a need to solve the crime and not upon any objective need to protect the public *(see, Orozco v Texas,* 394 US 324). This unwarranted delay in providing the appellant with his *Miranda* rights is exacerbated by the fact of his youth. As we so recently observed in *People v Hall* (125 AD2d 698), "over and beyond the ordinary constitutional safeguards provided for adults subjected to questioning, the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed *(see, Haley v Ohio,* 332 US 596)" *(People v Hall, supra,* at 701).

In sum, we conclude that the facts here do not support a finding of exigent circumstances sufficient to justify the application of the public safety exception to the *Miranda* rule. Accordingly, the appellant's statements in response to questioning as to the location of the gun should have been suppressed.

Mollen, P. J., Bracken and Spatt, JJ., concur.

Ordered that the order of disposition is reversed, on the law and the facts, without costs or disbursements, the fact-finding order is vacated, so much of that branch of the appellant's omnibus motion which was to suppress his "second" statement to the police is granted, and the matter is remitted to the Family Court, Queens County, for further proceedings.