[685 NYS2d 437]

The People of the State of New York, Appellant, v Steven Oquendo, Respondent.

First Department, February 9, 1999

APPEARANCES OF COUNSEL

*Bruno C. Bier* of counsel (*Donald J. Siewert* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Phyllis M. Mingione* for respondent.

## OPINION OF THE COURT

ROSENBERGER, J. P.

Defendant and codefendant, Steven Pichardo, were charged with criminal possession of a weapon in the second and third degrees (Penal Law §§ 265.03, 265.02 [4]). After a combined *Huntley/Mapp* hearing, the hearing court suppressed the gun and the statements that defendant had made at the station house both before and after receiving his *Miranda* warnings, on the grounds that the police questioning did not fall within the "public safety" exception to the *Miranda* rule enunciated in *New York v Quarles* (467 US 649). The post-*Miranda* statements were suppressed on the ground that there was an insufficient break to attenuate the influence of the allegedly improper pre-*Miranda* interrogation (*People v English*, 73 NY2d 20, 24). Though the indictment has not been dismissed, the People have certified that suppression of this evidence has foreclosed any reasonable possibility that they can prove their case (CPL 450.50). We disagree with the motion court's application of *Quarles* to the facts of this case and find that defendant's motion to suppress should have been denied.

At the *Mapp/Huntley* hearing, the court found neither side's story completely credible and consistent and made the following findings of fact. Around 9:00 P.M. on February 3, 1996, Officer (now Detective) Lozada responded to a radio report of shots fired. The report stated that a man with a gun, dressed in a black vest and army fatigues, was running down 101st Street toward Third Avenue. Upon reaching the broadcast location, Officer Lozada saw defendant running down 101st Street and across Third Avenue, looking backwards as he ran. He was wearing a black vest and a camouflage jacket. Officer Lozada pursued defendant through the interior and courtyard of a nearby housing complex and eventually apprehended him trying to enter a building on 99th Street and Second Avenue.

Officer Lozada approached defendant, with gun drawn, and told defendant to put his hands up. He asked defendant whether he had the gun, and defendant replied, "No. When I fell down, I dropped it. It's only a BB gun. I dropped it on 101st Street and Third Avenue."

The backup team then arrived and handcuffed defendant. Detective McGhee, who had called in the radio report, also arrived and identified defendant as the man who had pointed a gun at him and another officer on 101st Street and Lexington Avenue. Officer Lozada retraced defendant's steps but could not find the gun. The streets were covered with almost a foot of snow. When Officer Lozada returned to the arrest location, defendant offered to show the police where he had left the gun. He directed them to 101st Street between Third and Lexington Avenues. They searched unsuccessfully for 10 to 15 minutes.

Officer Lozada called the Emergency Service Unit to assist in the search. Meanwhile, defendant was taken to the precinct. He was questioned intermittently by Officer Lozada and Detectives Barletta and Torres from 9:40 P.M. to 12:05 A.M., when he was given his *Miranda* warnings. The questions mainly involved the location of the gun, though a few were unrelated. Defendant made statements about other aspects of the case, such as why he was running and whether he knew that he had pointed the gun at police officers. The officers would ask him about where the gun might be, and then go out to search that spot in vain, and afterwards return and resume questioning.

Defendant's mother came to the station house that evening, before the police read him his rights, but was not allowed to see defendant. She called out to him that he should wait to talk until she got him a lawyer. However, defendant never requested to speak with his mother or a lawyer.

At about 2:40 A.M., Detective McGhee entered the interview room. He told defendant that codefendant Pichardo had revealed that the gun was not a BB gun but a 9-millimeter handgun, and that if someone found the gun and was injured, defendant would be held responsible. At this point, defendant finally admitted that he had misled them as to the gun's location. He told them he had thrown it into the snow near a tree near 1809 Third Avenue. Detective McGhee, Officer Lozada and Detective Torres then took him to the vicinity of 1809 Third Avenue, where he directed Detective McGhee to the proper location, and the gun was recovered. Defendant and codefendant Pichardo were charged and indicted as noted above.

No question has been raised as to the propriety of the police pursuit and detention, defendant's arrest, or Officer Lozada's initial questions at the arrest location regarding the gun's whereabouts. It has long been the law in this State that an officer may ask questions to clarify a potentially dangerous situation before giving *Miranda* warnings (*People v Chestnut*, 51

NY2d 14, 22-23, *cert denied* 449 US 1018 [permissible to ask apprehended suspect about weapon]). The sole issue on this appeal is whether the exception set out in *New York v Quarles* (467 US 649, 652-653, *supra*) covers the questioning of defendant at the precinct. We hold that it does and reverse the motion court's determination.

In *Quarles*, the arresting officers were flagged down by a woman claiming that she had been raped by a gun-carrying man who had fled into a nearby supermarket. The police briefly pursued the suspect through the supermarket before apprehending him. Upon frisking him, the officer discovered that the man was wearing an empty shoulder holster. The officer asked where the gun was, and the suspect straightaway directed him to the supermarket carton where he had hidden it. The United States Supreme Court held that, notwithstanding the fact that the suspect was in custody and had not been read his *Miranda* rights before being questioned, the question about the gun's whereabouts was permissible because "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*" (*supra,* at 653). Applicability of the "public safety" exception does not depend on the officers' motivations. As long as there is an objective need to ask the questions in order to protect the public, it does not matter that the officers may also have desired to obtain incriminating evidence (*supra,* at 656).

This case presents the same basic public safety concerns. As long as the whereabouts of the gun in the supermarket remained unknown, an accomplice or another criminal might retrieve it, or an innocent bystander might later come upon it and be injured (*supra,* at 657). While it is true that the interrogation in *Quarles* was briefer than in the instant case, and occurred on the spot rather than in the station house later on, these differences do not detract from the essential similarity of the public danger in both cases, namely a missing (possibly loaded) gun, which was left in a publicly accessible place but could not be found readily without the suspect's cooperation. Naturally, the snow-covered, three-block area over which defendant fled would take longer to search than a single supermarket, particularly when the defendant here misled the police as to the gun's true location (*see, Interest of J.D.F.*, 553 NW2d 585, 587 [Iowa] [before reading *Miranda* warnings, police could continue to question suspect in the police car until he revealed where he left the gun in residential area]).

The entire thrust of *Quarles* is that the police should have flexibility to respond to true emergency circumstances, whether

the danger is momentary or ongoing (*supra,* at 656 ["spontaneity rather than adherence to a police manual is necessarily the order of the day" when dangerous situation is not yet under control]). That purpose would not be served by setting artificial limits as to the time and location of questions that are objectively necessary for the immediate public safety (*see, Trice v United States,* 662 A2d 891, 896 [DC App] [permitting questioning of suspect about gun an hour after he was apprehended, despite his invocation of right to silence]).

Other decisions of the courts of this State, though not factually identical to the case at bar, lend support to our reasoning here. In *People v Manzella* (150 Misc 2d 956), the police questioned the defendant over the phone for several hours while he was barricaded inside his house with a loaded gun. His residence was under siege by numerous officers because he had just shot two deputy sheriffs who tried to arrest him in his driveway (*supra,* at 957). By questioning him, the police sought to defuse the situation, determine whether there was anyone else in the house, and persuade him to surrender without harming himself or others (*supra,* at 958). "Whether these efforts took but a few minutes as in *Quarles* (*supra*) or many hours as occurred here * * * so long as the emergency condition continued unabated, the overriding concern for the safety of the public, the police, and even the defendant is paramount to defendant's individual right against self-incrimination" (*supra,* at 962). In *People v Allen* (240 AD2d 418, *lv denied* 90 NY2d 1009), an apparently bloodstained man entered the police precinct and confessed that he had just stabbed his girlfriend. The officer's question as to the whereabouts of the knife was permitted under the public safety exception. Thus, clearly *Quarles* is not confined to brief interrogations nor to interrogations occurring outside the station house.

The cases relied upon by the motion court are factually inapposite. In this case, it was unnecessary to override the suspect's right to *Miranda* warnings because the police were able to secure the limited area where the weapon might be located, which gave them the time to search for the dangerous item without fear that a member of the public might come upon it first (*Matter of John C.,* 130 AD2d 246 [apartment]; *People v Strickland,* 169 AD2d 9 [environs of defendant's home in isolated rural area]). By contrast, the police here had no alternative to questioning the defendant, since it would be impossible to secure several heavily snow-covered populated Manhattan blocks.

Accordingly, the order of the Supreme Court, New York County (Bruce Allen, J.), entered on or about March 28, 1997, granting defendant's motion for suppression of statements to the police at the station house and a gun recovered as a result of those statements, should be reversed, on the law, and the motion denied.

NARDELLI, WILLIAMS and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered on or about March 28, 1997, reversed, on the law, and defendant's motion to suppress denied.