*215 OPINION OF THE COURT
Charles J. Markey, J.
The major legal issue presented by this case is whether the court should employ the “public safety exception” to the Miranda rule, enunciated in New York v Quarles (467 US 649 [1984]), in deciding whether or not to suppress defendant Laura Swoboda’s statements concerning the whereabouts of her baby who had been missing for 11 days. If the “public safety” exception is not squarely applicable, the next issue is whether or not this court should adopt a “rescue doctrine/private safety exception” regarding the mother’s pre-Miranda statements.
Defendants Charles Swoboda and Laura Swoboda, by a misdemeanor information dated November 21, 2000, are accused of the crimes of reckless endangerment in the second degree (Penal Law § 120.20) and endangering the welfare of a child (Penal Law § 260.10 [1]).
Both defendants were granted Huntley!Dunaway hearings. The court held such a hearing over three days, on May 29, June 22, and July 23, 2001.
Two witnesses testified for the People, Detective Edward G. Dowd and Detective Joanne Toole of the 102nd Police Precinct Detectives Squad. The court finds that their testimony is credible. The defense did not present witnesses.
Findings of Fact
According to the accusatory instrument, an eyewitness, Ms. Arlet Dipini, stated that she observed the defendants, on November 5, 2000, injecting themselves with heroin. Ninety minutes later, defendant Laura Swoboda gave birth to a son, Christopher. Her husband, defendant Charles Swoboda, participated in the birth by allegedly tying the umbilical cord with a garbage twist tie and cutting the cord with a dirty razor.
The defendants had four other children removed by the City of New York Administration for Children’s Services. Based on information supplied by Ms. Dipini, the Family Court of the City of New York (Clark, J.) issued a bench warrant on November 15, 2000, for the arrest of the defendants concerning the birth of Christopher, the Swoboda’s fifth child.
Police officers of the 102nd Police Precinct arrested the defendants pursuant to the warrant on November 16, 2000, at about 4:00 p.m. Detective Dowd was the “catch detective” for that particular tour of duty, assigned to handle miscellaneous cases as they were assigned or arose.
*216 He was familiar with defendant Charles Swoboda because of previous contacts with the law. Detective Dowd asked defendant Charles Swoboda why he was arrested, and he responded that it had to do with the birth of a child.
Without giving to defendant Laura Swoboda the warnings generally required by Miranda v Arizona (384 US 436 [1966]), Detective Dowd questioned her, at about 8:30 p.m. of November 16. She had been kept in a separate cell and a separate area from her husband. Defendant Laura Swoboda, at first, advised Detective Dowd that she had not given birth to a child and had not been pregnant. She explained that she had “a very heavy period.” (Transcript, May 29, 2001, at 6.)
Detective Dowd then questioned defendant Charles Swoboda, who became agitated and started cursing, at which point Detective Dowd gave him Miranda warnings.
Detective Dowd, using a ruse, falsely informed each of the Swobodas that the other spouse had admitted that defendant Laura Swoboda gave birth to a baby. When so informed, defendant Charles Swoboda erupted: “Fuck you. I’m not telling you where that baby is. You took my last baby. Fuck you. I’m not going to tell you where this one is.” (Transcript, May 29, 2001, at 10-11; Transcript, June 22, 2001, at 43.) He later falsely advised Detective Dowd that the baby, Christopher, had been taken to some southern state.
When Detective Dowd went back to defendant Laura Swoboda and related that her husband confessed that there was a baby, she admitted it. Detective Dowd still had not given defendant Laura Swoboda her Miranda warnings when discussing the baby with her.
Detective Dowd repeatedly testified that his questioning of the defendants was motivated solely by his desire to locate Christopher and get the baby medical attention. Detective Dowd testified that he was advised that a baby was bom “and I needed to know what condition this baby was in.” (Transcript, June 22, 2001, at 16.) He added: “I was more concerned about trying to find the baby at that point than trying to making an arrest o[f] someone.” (Id. at 19.)
Based on Detective Dowd’s conversations with the Swobodas, the police eventually located Christopher in a private house in Queens County and brought him to Jamaica Hospital where he was treated for heroin withdrawal.
Upon hearing of their baby’s hospitalization, both parents asked for information about his health. Specifically, that night *217 of November 16, 2000, at 10:30 p.m., defendant Charles Swoboda and Detective Toole looked at each other, in silence, and Detective Toole finally said: “Your child is doing okay, but the child is shaking, and the nurse said the child is going through withdrawal symptoms.” (Transcript, July 23, 2001, at 6.) He responded: “I’m surprised I’m not going through withdrawal symptoms. I take heroin every day.” Detective Toole then said, “I hope you’re not going to have any [more] children.” Defendant Charles Swoboda replied that he planned to have more children, but not in Queens County. “To[o] many snitches in Queens,” he added. (Transcript, July 23, 2001, at 6.)
This conversation between Detective Toole and defendant Charles Swoboda was not preceded by any Miranda warnings.
Conclusion of Law
Although this court gave the parties an extended period of time to brief what the court believed were significant issues of law posed by this case, none of the submissions confronted the relevant issues of law, mentioned the correct and applicable legal doctrines as exceptions to Miranda, or discussed whether they should apply.
The principal question on this suppression motion, although not briefed by any of the parties, is whether the exception to Miranda set forth in New York v Quarles (467 US 649, supra) covers the questioning of defendant Laura Swoboda at the police station house.
In Quarles, a woman flagged down police and reported to them that she had just been raped and that her gun-carrying assailant fled into a supermarket. (467 US at 651-652.) A police officer apprehended the alleged attacker and, upon discovering his empty shoulder holster, asked him where the gun was — without providing the suspect Miranda warnings. The attacker, already handcuffed, nodded in the direction of some empty cartons and said, “the gun is over there.” (Id. at 652.) The officer then asked him other questions concerning the purchase and ownership of the gun, which the perpetrator answered. (Id.)
The United States Supreme Court in Quarles stated: “[T]his case presents a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda.” (Id. at 653.)
In creating a “public safety exception,” the Supreme Court stated that the subjective motivation of the individual officer was irrelevant. (Id. at 653, 656.) The Court believed that the *218 concern for the public’s safety outweighed the interest of protection of the Fifth Amendment privilege embodied in Miranda. (Id. at 656-657.)
Key to the Court’s thinking was the immediacy of the situation. The Court made repeated references to such exigent circumstances. First, the Court stated that the police officer in Quarles, upon seeing an empty shoulder holster, was confronted “with the immediate necessity of ascertaining the whereabouts of a gun.” (Id. at 657 [emphasis added]). So long as the gun was hidden in the supermarket, “it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.” (Id. at 657.)
Underscoring the exigency, the majority of the Supreme Court again cited sympathetically the rapidly developing circumstances and choices that confront a police officer’s daily duties. The Court stated:
“We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.” (467 US at 657-658 [emphasis added].)
Finally, the Court in Quarles, quoting its decision in Dunaway v New York (442 US 200, 213-214 [1979]), remarked that police officers “have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.” (467 US at 658.)
In order to establish the need for invoking the “public safety exception” to Miranda, adopted by the Supreme Court in Quarles (467 US at 657), the state generally must demonstrate that: (1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and (4) the questions asked were related to that danger and reasonably necessary to secure public safety. (State v Prim, 134 Ohio App 3d 142, 154, 730 NE2d 455, 463 [1999].)
Interestingly, although the Supreme Court in Quarles reversed a 4 to 3 holding of the New York Court of Appeals (58 *219 NY2d 664 [1982]), a few months before the reversal, the New York Court of Appeals held that a defendant’s Sixth Amendment right to counsel was not violated when police questioned him as to the whereabouts of a kidnap victim. Specifically, in People v Krom (61 NY2d 187 [1984]), the Court of Appeals recognized an “emergency exception” in not suppressing the responses to questioning of an alleged kidnapper who had invoked his Sixth Amendment right to counsel. The Court of Appeals stated:
“When the police are searching for a person who has recently disappeared, the need to provide prompt assistance is not terminated once the police learn that the person has been abducted. Even if the suspected kidnapper has been arrested the police emergency role may continue as long as the victim’s whereabouts remains unknown. It would not be reasonable or realistic to expect the police to refrain from pursuing the most obvious, and perhaps the only source of information by questioning the kidnapper, simply because the kidnapper asserted the right to counsel after being taken into custody.” (Krom, 61 NY2d at 199-200; accord, People v Molina, 248 AD2d 489, 490 [2d Dept], lv denied 92 NY2d 902 [1998].)
The Court of Appeals in Krom excluded statements made once the victim’s body was found. (61 NY2d at 200; accord, People v Molina, supra, 248 AD2d at 490.)
In cases decided after Quarles, involving negotiations over hostages, the New York courts have permitted the questioning under the “public safety exception” enunciated in Quarles. (See, e.g., People v Scott, 269 AD2d 96 [4th Dept], lv denied 95 NY2d 892 [2000]; People v Treier, 165 Misc 2d 665 [Monroe County Ct 1995]; accord, People v Mayfield, 14 Cal 4th 668, 733-734, 928 P2d 485, 521-522, cert denied 522 US 839 [1997].) These hostage cases showed that the courts were lumping into the “public safety exception” not simply cases involving a risk to the public at large, but also situations where a particular individual’s life was threatened.
Other cases have followed suit in not distinguishing between a danger or harm posed to the public at large as opposed to a specific individual’s life. (See, e.g., Thomas v State, 128 Md App 274, 737 A2d 622, cert denied 357 Md 192, 742 A2d 521 [1999] [suspect, who bit police detective, apologized and permitted blood tests to be done for fear of possible transmission of infec *220 tious disease]; State v White, 619 A2d 92 [Me Sup Ct 1993] [statements as to location of victim].)
Concerned that some decisions were lumping into the “public safety exception” situations that went far beyond the confines of Quarles, courts began developing a “rescue doctrine” or “private safety exception” to Miranda. The “rescue doctrine/ private safety exception” has been discussed, analyzed, or adopted in the following cases: People v Stevenson (51 Cal App 4th 1234, 59 Cal Rptr 2d 878 [1996] [police could question suspect who admitted to swallowing rock cocaine]); People v Manning (672 P2d 499 [Colo 1983] [en banc]); People v Laliberte (246 Ill App 3d 159, 615 NE2d 813, appeal denied 152 Ill 2d 570, 622 NE2d 1218 [1993], habeas corpus denied sub nom. United States ex rel. Laliberte v Gilmore, 1995 WL 319550, 1995 US Dist LEXIS 7149 [ND Ill 995] [armed abductor kidnapped baby]); Benson v State (698 So 2d 333 [Fla App 1997] [defendant swallowed crack cocaine and faced a life-threatening emergency]); Thomas v State (128 Md App 274, 737 A2d 622, supra); State v Provost (490 NW2d 93 [Minn 1992], cert denied 507 US 929 [1993] [defendant told police that he burned his wife and that she was somewhere, in rough, winter conditions, in a wildlife refuge]); and State v Kunkel (137 Wis 2d 172, 181, 404 NW2d 69, 73, review denied 138 Wis 2d 531, 412 NW2d 893, cert denied 484 US 929 [1987] [under the rescue doctrine, until the child’s body was found, the rights of the missing child were paramount to defendant’s right not to incriminate himself]; see also, State v Franks, 119 NM 174, 889 P2d 209 [1994] [defendant’s cocaine overdose]).
To qualify for admission under the “rescue doctrine/private safety exception,” the failure to give Miranda warnings is excused where there exists: (1) an urgent need, and no other course of action promises relief; (2) the possibility of saving human life by rescuing a person in danger; and (3) rescue as the primary purpose and motive of the interrogator. (People v Riddle, 83 Cal App 3d 563, 576, 148 Cal Rptr 170, 177 [1978], cert denied 440 US 937 [1979].) In Quarles, under the public safety exception, the motive of the police officer in questioning a suspect is irrelevant. Under the rescue doctrine, the officer’s motive is critical and decisive.
Turning to the case at bar, this court believes that application of the Quarles “public safety exception” is inappropriate. First, although one commentator has justified lumping under the Quarles “public safety exception” dangers that exist in both the public and private settings (Raphael, The Current Scope of *221 the Public Safety Exception to Miranda under New York v. Quarles, 2 NY City L Rev 63, 76-77, 81 [1998]), this court believes that Quarles was addressed to dangers posed to the public at large. A “rescue doctrine” or “private safety exception” should be applicable to excuse compliance with Miranda where a particular, identifiable life is threatened or endangered.
More important is the element of temporal immediacy. As related above, the Supreme Court in Quarles related that time was of the essence in police situations, and that police were forced to make decisions “often in a matter of seconds,” whether to give Miranda warnings or to neutralize a volatile situation. (467 US at 657-658.) In the present case, Christopher Swoboda was born on November 5, the Family Court did not issue a warrant until November 15, the defendants were arrested on November 16 at 4:00 p.m., but the questioning did not begin until 8:30 p.m. that night.
In this case, the police did not begin an intense questioning of the Swobodas aimed at learning Christopher’s whereabouts with any astonishing speed. Police officers, on field assignment, arrested the Swobodas pursuant to the bench warrant and put them in separate holding cells in the station house. They remained there, until Detective Dowd asked defendant Charles Swoboda why he was in the holding cell, and only later the questioning of both defendants began.
This case thus lacks the intense, temporal immediacy presented in Quarles, where it was evident that a gun had been hidden somewhere in the supermarket. Yet, in the case at bar, a reasonable person cannot deny that the need to find baby Christopher was also critical to the infant’s survival, and, hinging on a judicial determination of the motives for the questioning of the suspects — who alone knew where the baby could be found — employment of a “rescue doctrine/private safety exception” would permit even the tardy questioning.
The court believes Detective Dowd’s testimony that his sole motive was to locate Christopher and ascertain his medical condition. Once the questioning of the defendants began, the police found Christopher within two hours and secured for him vital medical attention.
Under the “rescue doctrine/private safety exception,” the court holds, in short, that (1) the “rescue doctrine/private safety exception” to Miranda, and not the “public safety exception,” is applicable; (2) applying its prior holding in People v Krom (61 NY2d 187, 198-200, supra), the New York Court of Appeals *222 would adopt the “rescue doctrine/private safety exception” to Miranda; and (3) all three elements required for application of the “rescue doctrine/private safety exception,” enumerated above, have been satisfied in the present case. This court, accordingly, denies the motion of defendant Laura Swoboda to suppress her statements.
Defendant Charles Swoboda’s motion can be divided as to his separate conversations, first with Detective Dowd, and two hours later with Detective Toole. At 8:30 p.m. of November 16, 2000, Detective Dowd advised defendant Charles Swoboda of his rights under Miranda. Regarding the first set of statements, he waived his Fifth Amendment privilege by his extended, oral statements to Detective Dowd, quoted above.
In the two-hour hiatus between Charles Swoboda’s statements to police, his son had been found alive. The second conversation began with Detective Toole advising defendant Charles Swoboda that his son was then receiving medical attention and would indeed survive.
The court notes that had it been Laura Swoboda who made the statements in the later exchange with Detective Toole, without the recital of Miranda warnings, they would have been suppressed. Under both the “rescue doctrine/private safety exception” and the “public safety exception” of Quarles, statements made by a suspect to police during an ongoing effort to find a missing victim or a concealed weapon are admissible. Once the emergency no longer exists, statements made without the benefit of Miranda warnings cannot be admitted. (See People v Krom, supra, 61 NY2d at 200; People v Molina, supra, 248 AD2d at 490.)
In the present case, the statements made to Detective Toole were, in fact, made by defendant Charles Swoboda, who had already been advised of his Miranda rights, two hours earlier. His effort to suppress the second set of statements, i.e., those made to Detective Toole, must also be rejected. First, at all times, he knew he was arrested on a bench warrant relating to Christopher’s disappearance, and there was no need for Detective Toole to repeat the warnings to a talkative defendant. (See People v Crosby, 91 AD2d 20, 29-30 [2d Dept], lv denied 59 NY2d 765 [1983]; accord, People v Hotchkiss, 260 AD2d 241, 241-242 [1st Dept], lv denied 93 NY2d 1003 [1999].)
Second, the court notes that defendant Charles Swoboda is not a novice to the criminal justice system. His criminal record, spanning an 18-year period, includes numerous arrests and convictions for both felonies and misdemeanors. His claim *223 that he needed to be reminded of his Miranda rights thus rings hollow. (See People v John, 288 AD2d 848 [4th Dept 2001]; People v Hotchkiss, supra, 260 AD2d at 241; People v Strother, 234 AD2d 571, 572 [2d Dept 1996], lv denied 89 NY2d 1016 [1997]; People v Sobchik, 228 AD2d 800, 802-803 [3d Dept 1996]; People v Bennett, 221 AD2d 349, 350 [2d Dept 1995], lv denied 87 NY2d 970 [1996].)
The motions by defendants to suppress the statements made to police are, accordingly, in all respects, denied.