796 A.2d 274 (2002)
350 N.J. Super. 517
STATE of New Jersey, Plaintiff-Respondent,
v.
Umoja STEPHENSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 13, 2002.
Decided May 6, 2002.
*275 Peter A. Garcia, Acting Public Defender, for appellant (Frank J. Pugliese, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, for respondent (Julie A. Higgs, Deputy Attorney General, of counsel and on the brief).
Before Judges A.A. RODRIGUEZ, LEFELT and LISA.
The opinion of the court was delivered by LISA, J.A.D.
We are called upon in this case to measure the limits of the public safety exception to the Miranda[1] rule. No New Jersey case has previously addressed whether the exception can apply to unwarned custodial interrogation about the presence and whereabouts of a gun believed to be in a private location. We conclude the exception can apply in such a situation. However, the circumstances in this case do not warrant its application, and the trial judge erred in denying defendant's motion to suppress.
After defendant's suppression motion was denied, he pled guilty to third-degree possession of a controlled dangerous substance (CDS) with intent to distribute (N.J.S.A. 2C:35-5a(1) and -5b(3)) and second-degree possession of a firearm while in the course of violating N.J.S.A. 2C:35-5 (N.J.S.A. 2C:39-4.1a). Pursuant to a plea agreement, he was sentenced to five years imprisonment on the weapons offense and a concurrent four years imprisonment on the CDS offense. Appropriate monetary sanctions and loss of driving privileges were imposed.
On appeal, defendant argues:
POINT ONE
THE FACTS AND CIRCUMSTANCES OF THIS CASE DO NOT SUPPORT THE MOTION COURT'S FINDING THAT THE REQUIREMENT TO ADVISE DEFENDANT OF HIS CONSTITUTIONAL RIGHTS *276 AND FOR A WARRANT TO SEARCH WERE OBVIATED BY THE PUBLIC SAFETY EXCEPTION. ADDITIONALLY, DEFENDANT WAS COERCED INTO REVEALING THE LOCATION OF THE EVIDENCE SEIZED. (U.S. CONST. Amends. IV, V and XIV; N.J. CONST. (1947) Art. I, Par. 7).
A. The Public Safety Exception To The Miranda Rule Was Misapplied In This Case.
B. Additionally, Defendant Can Not Be Deemed To Have Consented To The Search Of The Dresser Drawer As He Was Coerced Into Revealing The Location Of The Evidence Seized.
We agree and reverse.[2]
At the motion hearing, Officer Barry Dubrosky and defendant testified. The judge credited Dubrosky's testimony and discredited defendant's. His factual findings are supported by adequate and substantial evidence in the record, State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964), and are essentially as follows.
On January 22, 1999 at approximately 7:30 a.m., Barbara Williams called the Neptune police, reporting a threat to her son, Vernon. When the police arrived, Barbara was upset and explained that Vernon had an argument on the telephone with someone known as Moe, who threatened to put a bullet into Vernon. Using her "Star 69" feature, Barbara learned that the call to her home had originated at the Crystal Inn Motel (motel). Vernon and his brother had left before the police arrived, apparently going to the motel. Barbara's brother had also left, after the "Star 69" inquiry, to look for his nephews. While the police were still at the Williams' home, they heard a radio dispatch reporting a call from the motel manager indicating that three men in a vehicle matching the description of that driven by Barbara's brother told the manager "to call the police, somebody may get shot."
When police units arrived at the motel, the three men were exiting their vehicle. Vernon informed the police that defendant (Moe) was in Room 115 and had threatened him earlier during their telephone conversation, stating he was going to put a bullet in his mouth or head. Some officers remained outside with the three men. Three officers proceeded to Room 115, knocked, and identified themselves as the police. After a brief pause, defendant opened the door. He was alone. The police advised defendant they were there with reference to a threat he may have made to Vernon Williams. Defendant became boisterous, explaining he had argued *277 with someone over a female. The police asked if they could step inside to continue the conversation. Defendant agreed and all three officers entered.
Defendant became nervous, pacing back and forth and stuttering, with his hands trembling somewhat. When defendant stated he could not stand still, the officers directed him to sit in a chair. Dubrosky then asked him if he had any weapons, to which defendant responded, "Not on me." The officers then pat searched defendant, with negative results. Dubrosky then asked "[W]here is the gun?" Defendant looked startled, sat back in the chair, and looked down at the floor shaking his head from left to right. The police then handcuffed defendant. Dubrosky justified this action because after the pat search defendant was increasingly nervous, he began to sweat profusely, his heart rate began to race, and he was looking at the front door and the sliding glass doors at the other end of the room, as if possibly looking for a way to flee.
Dubrosky informed defendant he was not under arrest, but "was being detained." Dubrosky candidly acknowledged, however, that once defendant was handcuffed he was not free to leave. The police did not advise defendant of his Miranda rights. Dubrosky then told defendant "he could cooperate with us and [tell] where the gun is or that we could go through the court and apply for a search warrant of the room." After sitting silently for a moment, defendant gestured with his head towards the dresser that was approximately three to four feet away from him, and stated the gun was in the drawer in a blue bag. When asked to describe the gun, he did so.
The police then opened the drawer, removed a blue bag and opened it, finding the gun, matching the description given by defendant, and CDS (and drug paraphernalia), which provided the basis for defendant's weapons and CDS convictions. The police then arrested defendant and advised him of his Miranda rights. Defendant was never charged with terroristic threats, as Vernon was apparently not interested in pursuing such a charge. Later that afternoon, defendant gave a signed, written statement at the station house.
From the moment defendant was handcuffed (if not sooner), he was in police custody, having been significantly deprived of his freedom. Miranda v. Arizona, supra, 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. Further, there can be no dispute that posing the direct question "[W]here is the gun?" constitutes interrogation. See State v. Ward, 240 N.J.Super. 412, 418, 573 A.2d 505 (App.Div.1990). The State does not refute this. It argues, however, that the police were not required to give Miranda warnings prior to this custodial interrogation under the public safety exception announced by the United States Supreme Court in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
The trial judge agreed. Relying on Quarles, in light of his factual findings, he concluded:
They are all specific articulable facts from which these officers could conclude the weapon was, in fact, in that room.

....
Now, these officers have an obligation to protect themselves and anyone outside who this individual threatened to put a hole in his head.

The court does not find under these circumstances that the MIRANDA warnings were necessary as they were in pursuit of public safety in trying to locate that gun and secure that gun.

[Emphasis added.]
*278 In Quarles, defendant was suspected of just having raped a woman, while carrying a gun. The woman described her attacker and advised the police he had entered a nearby supermarket. When the police entered the supermarket, defendant, who matched the description, saw them and ran to the rear of the store, out of the view of the police. When the police apprehended him, they frisked him and found he was wearing an empty shoulder holster. The police immediately handcuffed him and, without administering Miranda warnings, asked where the gun was. Defendant nodded in the direction of some empty cartons and said "The gun is over there." Id. at 652, 104 S.Ct. at 2629, 81 L.Ed.2d at 554.
Under these circumstances, the Court found that concern for public safety must be paramount to adherence to the literal language of the prophylactic Miranda rule, id. at 653, 104 S.Ct. at 2630, 81 L.Ed.2d at 555, thereby justifying a "public safety" exception to the Miranda rule. Id. at 655-66, 104 S.Ct. at 2631, 81 L.Ed.2d at 557. Critical to the Court's holding was that the police, "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." Id. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 557-58. (Emphasis added). The Court thus reasoned that "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." Id. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. (Emphasis added).
The State further relies on State in Interest of A.S., 227 N.J.Super. 541, 548 A.2d 202 (App.Div.1988), in which we endorsed the Quarles public safety exception. There, a passing motorist reported to the police that he had just seen a person fire a handgun on the street at a particular location in Paterson. Responding police were informed that A.S. had the gun. When they saw A.S. walking on the street, he ran. They apprehended him and patted him down, with negative results. Without giving Miranda warnings, the police asked what he did with the gun. A.S. initially denied having a gun, but the police persisted, describing to him the information which led them to believe he had a gun. A.S. then admitted his knowledge of the existence and whereabouts of the gun, and he led the police to it. It was stashed behind the siding of a house in an alleyway in a residential neighborhood. Id. at 543-44, 548 A.2d 202.
Although the State conceded A.S. was under arrest when he was asked where the gun was, id. at 544, 548 A.2d 202, we rejected that concession as unsupported by the record. Id. at 546, 548 A.2d 202. We thus concluded this was an investigatory stop in which on-the-scene investigatory questioning, without Miranda warnings, is permissible. Id. at 546-47, 548 A.2d 202.
Alternatively, we found that, even if A.S. were in custody, the need for Miranda warnings was obviated by the Quarles holding. We quoted a passage from Quarles emphasizing the need "to insure that further danger to the public did not result from the concealment of the gun in a public area." Id. at 548, 548 A.2d 202. We then concluded:
The location of the gun involved here demonstrates the value of a public safety exception. The gun was in an alleyway of a residential neighborhood. It was located in a place where even a small child or someone bent on pursuing criminal conduct may have found it. Also, *279 locating the gun was important for the protection of the investigating police officers as well as the public in general. Hence, we hold that Miranda warnings were not required before the limited questioning of A.S.
[Ibid. (Emphasis added).]
In A.S., the gun was fired in the street and A.S. was seen walking in the street of this residential neighborhood. This gave rise to a reasonable belief that the gun was either on his person or had been discarded in a public area. After the negative pat search, of course, the choice was narrowed to the public area. Therefore, a reasonably objective need to protect the public existed.
In the case before us, a gun was not actually observed as in Quarles and A.S., and the circumstances of the threat were remote in time and place rather than immediate as in those cases. Nevertheless, the totality of the circumstances supported a reasonable and articulable suspicion that defendant might be in possession of a gun. Thus the police acted reasonably in investigating the alleged threat to Vernon Williams, and the investigatory on-the-scene questioning and pat search were justified. We need not determine whether at any point prior to being handcuffed defendant was in custody, because he did not reveal the presence of the gun until after he was handcuffed and was clearly not free to leave. See State v. Coburn, 221 N.J.Super. 586, 535 A.2d 531 (App.Div.1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988). In this case, however, the gun was believed to be not in a public area as in Quarles and A.S., but in a private area, defendant's motel room. Whether the public safety exception can apply in such a situation has not heretofore been addressed in New Jersey.[3]
The essential underpinning of the public safety exception to the Miranda rule is the "objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." New York v. Quarles, supra, 467 U.S. at 659, n. 8, 104 S.Ct. at 2633, n. 8, 81 L.Ed.2d at 559, n. 8. There must be a compelling and exigent need, under the totality of the circumstances, to protect the police or the public. In order to establish the need to invoke the exception, the State must generally demonstrate "(1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety." State v. Prim, 134 Ohio App.3d 142, 730 N.E.2d 455, 463 (1999), Motion for Delayed Appeal Denied, 88 Ohio St.3d 1436, 724 N.E.2d 811 (2000).
The exception was characterized by the Quarles Court as a "narrow exception," New York v. Quarles, supra, 467 U.S. at 658, 104 S.Ct. at 2632, 81 L.Ed.2d at 558, which "in each case ... will be circumscribed by the exigency which justifies it." Id. at 658, 104 S.Ct. at 2633, 81 L.Ed.2d at 559. As such, the exception should be narrowly construed. To sanction unwarned *280 questioning about the presence or whereabouts of a gun in every case where a gun is suspected would result in the exception swallowing the rule. See, e.g., U.S. v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995) (holding that where a suspected drug dealer was arrested in his apartment naked (and obviously unarmed) and alone, and was Mirandized and invoked his right to counsel, subsequent questioning about weapons in the apartment was not covered under public safety exception as there was no immediate need to protect the public or the police); U.S. v. Rodriguez, 931 F.Supp. 907, 911 (D.Mass.1996) (holding that where defendant responded to a question about the presence and whereabouts of a gun in the apartment after being advised of Miranda rights but not having waived them, after he and two other suspects were in custody, the apartment was thoroughly secured and a preliminary sweep revealed certain incriminating evidence, defendant had been removed from the apartment and approximately fifteen minutes had passed since his arrest, there was no immediate danger to justify an objectively reasonable need to protect the public or police); In the Matter of John C., 130 A.D.2d 246, 519 N.Y.S.2d 223, 227 (1987) (holding that where the officer began his investigation immediately upon confronting the minor by questioning him first about why he had shot the victim and not about the whereabouts of the gun, and where the apartment was secured by at least fourteen officers, there was no volatile situation requiring immediate action which would fall under the narrow public safety exception).
Application of the exception generally requires, when the concern is for protection of the public, that the public at large, or at least an extended group of individuals, be potentially at risk. See e.g. Edwards v. U.S., 619 A.2d 33 (D.C.1993) (holding that when officers witnessed an armed suspect enter an apartment building that was partially occupied, but was easily accessible to vagrants, reappear unarmed, questions about the weapon were reasonably prompted by a concern for the public safety); U.S. v. Lawrence, 952 F.2d 1034 (8th Cir.), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L. Ed.2d 434 (1992) (holding that when the suspect was apprehended near a Sears parking lot and voluntarily stated that he threw his gun away while fleeing, question about location of the gun was prompted by a reasonable concern that the gun might be found and do harm to an innocent child); People v. Hurst, 259 A.D.2d 1011, 688 N.Y.S.2d 306 (1999) (holding that after defendant was arrested and stated he had a gun, question about location of the gun was prompted by concern that numerous children resided in that neighborhood and one could potentially come across it); People v. Oquendo, 252 A.D.2d 312, 685 N.Y.S.2d 437 Leave to Appeal Denied, 93 N.Y.2d 901, 689 N.Y.S.2d 713, 711 N.E.2d 989 (N.Y.1999) (holding that a missing gun discarded within a populated, snow-covered, three-block area of Manhattan and not retrievable without the suspect's cooperation, created an ongoing public danger under Quarles as long as the gun was not found because the area was impossible to secure).
Concern for the safety of a specific individual is more appropriately treated under the rescue doctrine. See People v. Swoboda, 190 Misc.2d 214, 737 N.Y.S.2d 821, 827-28 (N.Y.CityCr.Ct.1999) (holding that where officer questioned unwarned defendants about the whereabouts of their baby, question was covered by rescue doctrine and not the public safety exception because there was a particular, identifiable life being endangered, creating 1) an urgent need, 2) the possibility of saving human *281 life, and 3) rescue was the primary motive of the officer). This consideration is not applicable here, because Vernon Williams' well-being was not in immediate danger and did not necessitate the unwarned questioning as the only means of possibly saving his life. Ibid. Outside such a context, the narrow exception of Quarles should not be extended out of concern for an individual not in immediate danger. See State v. Montoya, 937 P.2d 145, 151 (Utah Ct.App.1997) (holding that the public safety exception does not apply where defendant, who was under the influence of drugs, is the only person whose safety is endangered).
The discarded gun in Quarles was reasonably believed to be in a public place. However, the Court's rationale does not require this factor. In the totality of any particular set of circumstances, a missing gun in a private location, such as a home, apartment or motel room might pose the requisite danger to the police or public to justify the exception. However, to the extent that public safety is implicated, the gun must be reasonably believed to be in an unknown location (even if private) which is accessible to third parties and not reasonably capable of being secured. It is the overall circumstances, not merely the location, therefore, that controls. The Quarles Court fashioned the exception to deal with "a kaleidoscopic situation ... where spontaneity rather than adherence to a police manual is necessarily the order of the day," New York v. Quarles, supra, 467 U.S. at 656, 104 S.Ct. at 2631, 81 L.Ed.2d at 557, where it is necessary for the police to "neutralize the volatile situation confronting them." Id. at 658, 104 S.Ct. at 2632, 81 L.Ed.2d at 558.
In view of these principles, we consider the facts before us. Defendant's motel room was not a public place and was not accessible to the public. There is nothing to suggest defendant had an accomplice in his argument with Vernon Williams about a woman. There was no basis for the police to believe that, if defendant possessed a gun at all, it was anywhere other than on his person or in his motel room. Indeed, the trial judge so found and, on appeal, the State so argues.[4] The situation did not manifest a danger to the public. Again, the trial judge found a potential danger only to the threatened individual, Vernon Williams. Yet, this individual, after allegedly being threatened over the telephone at a remote location, drove to the location of the person allegedly making the threat, and was now outside in the presence of police officers while defendant was inside, handcuffed and in the custody of three police officers. Vernon Williams was in no immediate danger from defendant. Once defendant was handcuffed, there was no danger to the officers. With defendant restrained and isolated in the room with three officers, the police had the situation under control. Any exigency that previously may have existed was eliminated. See People v. Attebury, 463 Mich. 662, 624 N.W.2d 912, 918 (2001) (noting that officers executing a warrant for assault with a dangerous weapon on defendant who was known to have homicidal thoughts, could have mitigated the exigency by physically restraining defendant upon entering his apartment and before allowing him to dress).
Any perceived need by the police, after their initial non-custodial on-the-scene questioning, to determine the presence and whereabouts of a gun could have been *282 satisfied by various means. They could have Mirandized defendant and continued their questioning if he waived his rights. They could have requested a consent to search his room. Or they could have easily secured the room while a search warrant was requested. Indeed, they threatened as much to place added pressure on defendant to reveal the presence and whereabouts of the gun. Critical to our analysis is that the police held a reasonably objective belief that the location of a gun, if it existed at all, was limited to the motel room.
One further consideration informs our conclusion that the exception should not apply. In Quarles, the Court stated: "We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." New York v. Quarles, supra, 467 U.S. at 658-59, 104 S.Ct. at 2633, 81 L.Ed.2d at 559. After defendant told the police the gun was in the blue bag in the dresser drawer, the police asked him to describe the gun. This question along with others about defendant's argument with Vernon Williams, was investigative in nature, and not geared to the narrow purpose of locating the gun to protect the public. Id. at 659, 104 S.Ct. at 2633, 81 L.Ed.2d at 559. The Quarles Court distinguished Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), where defendant's unwarned statements, including his disclosure of the whereabouts of the gun, made in defendant's boardinghouse four hours after a murder had been committed, were suppressed, stating:
In Orozco, however, the questions about the gun were clearly investigatory; they did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon. In short there was no exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime.
[New York v. Quarles, supra, 467 U.S. at 659, n. 8, 104 S.Ct. at 2633, n. 8, 81 L.Ed.2d at 559, n. 8.]
The questioning of defendant in the case before us was prompted, in our view, by a desire to gather evidence against defendant regarding his alleged threat to Vernon Williams, rather than an overriding need to dispense with his Fifth Amendment rights because of an immediate need to protect themselves or the public.
The factual complex before us does not support a finding of a volatile situation contemplated by Quarles which required immediate police inquiry to defuse a potential threat to the public safety. Once defendant was handcuffed, as previously stated, there was no basis to find an immediate danger to the police, and the record contains no evidence of any immediate danger to the public. We therefore hold that under these circumstances the public safety exception does not apply.
Therefore, defendant's statements at the motel room after being handcuffed must be suppressed. So too must the physical evidence seized in direct response to the unwarned interrogation, namely the gun and the CDS and paraphernalia. State v. Hall, 253 N.J.Super. 84, 91, 600 A.2d 1248 (Law Div.1990), aff'd, 253 N.J.Super. 32, 600 A.2d 1221 (App.Div.1991); State v. Mason, 164 N.J.Super. 1, 3-4, 395 A.2d 536 (App.Div.1979).[5] The State advances *283 no other exception to the warrant requirement, and this was clearly not a consent search.
Defendant's conviction is vacated. The order denying defendant's motion to suppress evidence is reversed. The matter is remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] We reject the State's argument that we should not consider the substance of defendant's appeal because it involves a Miranda issue, not a Fourth Amendment search and seizure issue. The State argues that Rule 3:5-7(d), allowing an automatic right of appeal after a guilty plea from denial of a suppression motion does not apply, and because defendant did not enter a conditional plea pursuant to Rule 3:9-3(f), he has not preserved his right to appeal from an adverse Miranda ruling. At the plea hearing, after defendant commented he thought his rights were violated, his counsel elicited from him that he was disappointed he lost his motion to suppress, that he understood that despite his guilty plea he would be able to appeal that decision, and "[t]hat is what we are going to do when you are sentenced." The prosecutor expressed no exception. See State v. Alexander, 310 N.J.Super. 348, 351, n. 2, 708 A.2d 770 (App.Div.), certif. denied, 156 N.J. 408, 719 A.2d 640 (1998); State v. Matos, 273 N.J.Super. 6, 15, 640 A.2d 1176 (App.Div.1994). In light of this circumstance, we need not pass upon the applicability of Rule 3:5-7(d) to a motion such as that involved in this case, where Miranda and Fourth Amendment issues are interrelated.
[3] In State v. Pante, 325 N.J.Super. 336, 739 A.2d 433 (App.Div.), certif. denied, 163 N.J. 76, 747 A.2d 285 (2000), after defendant, while in police custody, invoked his right to counsel, the police continued to interrogate him about the presence of explosives and he ultimately admitted their presence at his residence. Id. at 342, 739 A.2d 433. Police searched Defendant's residence and found explosives. We acknowledged the existence of the Quarles public safety exception to the Miranda rule, but noted that "the State makes no argument that this principle should be extended to cases in which the police have failed to honor diligently a defendant's Fifth Amendment rights." Id. at 346, 739 A.2d 433. Accordingly, we analyzed the validity of the search on other grounds.
[4] In its appellate brief, the State argues: "The officer also was concerned because of defendant's response to the question of whether he had a weapon, which heightened the officer's suspicion that there might be [a] weapon on defendant's person or in the room."
[5] We do not comment on the admissibility of the written, signed statement defendant gave at the station house on the afternoon of his arrest. If the prosecutor chooses to proceed with prosecution of this case, any challenge to the admissibility of that statement must first be addressed by the trial court.