739 A.2d 433 (1999)
325 N.J. Super. 336
STATE of New Jersey, Plaintiff-Respondent,
v.
Matthew PANTE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1999.
Decided October 28, 1999.
*436 Christopher J. Orriss, Designated Counsel, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Orriss, of counsel and on the brief).
Gerard C. Sims, Jr., Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Mr. Sims, of counsel and on the brief).
Before Judges BAIME, EICHEN and WECKER. *434
*435 The opinion of the court was delivered by BAIME, P.J.A.D.
Following the denial of his motion to suppress evidence, defendant pled guilty to possession of explosives (N.J.S.A. 2C:39-3a), possession of an assault weapon (N.J.S.A. 2C:39-5f), theft by receiving stolen property (N.J.S.A. 2C:20-7), and possession of a defaced firearm (N.J.S.A. 2C:39-3d). The trial court sentenced defendant to a total of four years imprisonment. On appeal, defendant argues (1) the police unlawfully searched his residence, and (2) the sentence imposed is manifestly excessive. We disagree and affirm defendant's convictions.

I.
On April 29, 1994, defendant telephoned CBS television studios in New York City and told Stanley Romaine, the producer of "Forty-Eight Hours," that he possessed a large quantity of explosives. Defendant explained that he intended to surrender the explosives to federal authorities and that he had significant information concerning criminal conduct. When asked whether he had "proof of [his] claim," defendant responded that he had "ample evidence" with him. Defendant agreed to meet Romaine in front of the CBS studios. The police were immediately notified. Defendant appeared at the assigned time and place carrying a black briefcase. Noticing that defendant had placed his right hand in his pocket and concerned that he might be reaching for a weapon, Romaine grabbed him. At this point, defendant suddenly pulled out a pistol, one of two loaded firearms he had on his person. The police quickly appeared, causing defendant to drop the briefcase and flee from the scene. Defendant was apprehended a short distance away after a brief struggle.
Earlier the same day, an explosion had occurred approximately twenty blocks from the CBS studios. One person was killed. The police were thus wary that the two events were somehow related. Consequently, the City's bomb squad was summoned to retrieve the defendant's briefcase. Meanwhile, defendant was transported to police headquarters where he was questioned by Detective Edward Hennessy. After apprising defendant of his constitutional rights, the detective asked him "what was in the briefcase." Defendant did not immediately respond, but instead merely smiled. After a brief pause, defendant requested an attorney. Concerned that defendant's briefcase might contain a bomb, Hennessy disregarded *437 defendant's request and continued his interrogation. Although defendant repeatedly requested and was denied the assistance of a lawyer, he ultimately admitted that additional explosives were stored at his residence in Mansfield Township, New Jersey. At approximately 6:45 p.m., defendant signed a consent to search form which was faxed to Mansfield Township authorities.
Earlier in the afternoon, at approximately five o'clock, Chief Donald Hill of the New York City Police had telephoned Sergeant Patricia Mannon of the Mansfield Police and had informed her of defendant's arrest. Although the exact chronology of events is not entirely clear, it appears that by the time of Chief Hill's call, the New York City bomb squad had retrieved defendant's briefcase and had discovered that it contained explosives. It is also probable, but not certain at this point, that defendant had admitted additional explosives could be found at his home. In any event, Chief Hill described to Mannon the bizarre circumstances surrounding defendant's arrest, including his possession of explosives and firearms. Hill emphasized the possibility that additional explosives might be stored at defendant's residence. Mannon immediately notified the New Jersey State Police bomb squad and the Warren County Prosecutor's office, and then proceeded to defendant's home.
Mannon arrived at defendant's residence shortly after 5:30 p.m. She and other officers "cordoned off" the street and evacuated six nearby residences. Although no one was present in defendant's home, defendant's sister and niece arrived shortly thereafter, but were not permitted to enter the house. Defendant's mother, Mrs. Ruth Pante, arrived at approximately 6:15 p.m. She was told of defendant's arrest and the possible presence of explosives in her residence. Shaken and upset by these events, Mrs. Pante was escorted by Mannon to a neighbor's house. Other officers appeared and questioned Mrs. Pante about her son's activities and his mental and emotional condition. In her testimony at the motion hearing, Mrs. Pante described the officers, some of whom she knew previously, as "comforting and caring, ... constantly asking if [she] needed [assistance]." Mannon explained that it was important to remove explosives from Mrs. Pante's house. Mrs. Pante asked whether the police had a search warrant. Mannon replied that the police did not have a warrant but would obtain one if necessary. Although Mrs. Pante testified that she was told her son had consented to a search of the residence, Mannon denied that this information was conveyed to her. Mannon claimed that she was unaware that defendant had signed a consent form and thus could not have apprised Mrs. Pante of this fact. In any event, Mrs. Pante was permitted to telephone her employer, the law firm of Shanley and Fisher, where she worked as a legal secretary. After completing her call, a consent to search form was read to Mrs. Pante and was signed at 7:20 p.m.
Before entering the house, the police questioned Mrs. Pante concerning defendant's living quarters. Mrs. Pante described the "layout" of the house, noting that defendant occupied a bedroom on the basement-level floor. She told the police that the door to defendant's bedroom was locked, but that there was a key hanging on a pegboard in the attached garage. She stated that defendant had only recently begun to lock the door to prevent his niece from playing with his computer. Mrs. Pante noted that she used the keys only in emergencies and, although she owned the house, she "gave" defendant "his privacy," and did not "really go down to the downstairs [level] which was his."
At the motion hearing, Mrs. Pante characterized her living arrangement with defendant as that of landlord and tenant. She claimed that defendant either paid rent or performed services in lieu of rent. A bathroom had been installed adjacent to defendant's bedroom and he was the sole user of a small family room also situated in *438 the basement. Mrs. Pante testified that there was a laundry room and hallway facing the stairwell that were used by all members of the household, including her daughter and granddaughter. However, defendant had a separate telephone line, bought his own groceries, prepared his own meals and had his own refrigerator. It does not appear that these facts were conveyed to the police prior to the search.
The search was conducted by the State Police bomb squad and the Federal Bureau of Investigation. Using a key provided by Mrs. Pante, the officers entered the house through the front door. They then proceeded to the lower level and found the key to defendant's bedroom on the pegboard in the attached garage. A door which was unlocked led to a hallway. On the opposite end of the hallway was the door to defendant's bedroom. The door was locked. Before using the key to enter defendant's bedroom, the officers observed several objects scattered about the floor of the hallway. Upon closer inspection, the officers found "a spool of yellow blasting wire ... [used in] explosive demolition work," "black electric tape," "alligator clips," "nine volt batteries" and several sets of earplugs. Detective Steven McDougall of the State Police bomb squad, who led the search, testified that, based upon the discovery of these commonly used blasting implements, he was "fairly certain ... [he] was going to find more explosives." Because of the obvious danger, the officers believed that "time was of the essence." Even an otherwise innocuous police radio frequency could set off an explosion. As phrased by Detective McDougall, the officers' "primary purpose [was] to render the situation safe." "Collecting evidence to use in a criminal trial" was considered "secondary to safety."
Using the key, the officers entered defendant's bedroom. They first observed a cardboard box containing 314 electric blasting caps, 100 "hot light fuse caps," 100 "connecters for thermal light-type igniter cords," and several "lengths of fuse wires." Another box contained 893 "non-electric blasting caps." In defendant's closet, the officers discovered a number of firearms including assault weapons. Also in the closet was a closed duffel bag, containing additional firearms and assault weapons and four large-capacity ammunition magazines. Additional weapons were found in the top drawer of a filing cabinet. Among the other items confiscated from defendant's bedroom were pamphlets entitled "Home Workshop Silencer Book," "Improviser's Munitions Black Book," "Death Dealers Manual," "Silent Death," "Distributive Terrorism," "The Mini 14 Methods of Disguise," "Mac 1045 Sub Machine Gun Sever Plans," "Disguise Techniques," and "How to Get Anything on Anybody."
In denying defendant's motion, the trial court found that the New York City police violated his constitutional rights by rejecting his repeated requests for an attorney. Defendant's consent to search was found to be invalid on this basis. The court nonetheless determined that Mrs. Pante voluntarily consented to the search of her house and that she had apparent authority to permit the police to enter defendant's bedroom. The court also alluded to the exigent circumstances confronting the officers which were said to justify the entry into defendant's bedroom and the seizure of the highly incriminating evidence.
It is against this factual backdrop that we consider defendant's arguments.

II.
We begin with the well-settled principle that the police are constitutionally required to scrupulously honor a defendant's request to terminate questioning or to have counsel present during interrogation. See, e.g., Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 386, reh'g denied, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); State v. Hartley, 103 N.J. 252, 278, 511 A.2d 80 (1986); State v. Kennedy, 97 N.J. 278, 288, 478 A.2d 723 (1984); State v. Wright, 97 N.J. 113, 120, 477 A.2d 1265 *439 (1984); State v. McCloskey, 90 N.J. 18, 26, 446 A.2d 1201 (1982). Once it has been determined that there has been a failure to honor the previously invoked right, the resultant violation is a constitutional infringement requiring suppression of the defendant's statement. State v. Hartley, 103 N.J. at 279, 511 A.2d 80. Although the United States Supreme Court has created a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted in evidence, New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 557 (1984), the State makes no argument that this principle should be extended to cases in which the police have failed to honor diligently a defendant's Fifth Amendment rights. While we will return to the subject of public safety later in our opinion, we have no occasion to disturb the unchallenged finding of the trial court that defendant's statement and consent to search were involuntary.
As we have noted, the remedy for a violation of a defendant's Fifth Amendment right is the exclusion of the statement so obtained. The exclusionary prohibition extends as well to the indirect as well as the direct products of the constitutional invasion. Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963). Tangible or physical evidence which derives so immediately from a Fifth Amendment violation is no less the fruit of official illegality than the defendant's coerced statement. Thus, indirectly-obtained evidence is excluded as the "fruit of the poisonous tree." Id. at 487-88, 83 S.Ct. at 417, 9 L.Ed.2d at 455. "However, evidence is not subject to exclusion simply because it would not have come to light but for the illegal actions of the police." State v. Casimono, 250 N.J.Super. 173, 182, 593 A.2d 827 (App. Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 370 (1992). The critical determination is whether the authorities have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct. State v. Johnson, 118 N.J. 639, 653, 573 A.2d 909 (1990) (citing Brown v. Illinois, 422 U.S. 590, 604 n. 10, 95 S.Ct. 2254, 2262 n. 10, 45 L.Ed.2d 416, 427 n. 10 (1975)); State v. Hartley, 103 N.J. at 283, 511 A.2d 80; State v. Barry, 86 N.J. 80, 87, 429 A.2d 581 (1981). Three factors are considered in making this determination: (1) the flagrancy and purpose of the police misconduct, Brown v. Illinois, 422 U.S. at 604 n. 10, 95 S.Ct. at 2262 n. 10, 45 L.Ed.2d at 427 n. 10; State v. Worlock, 117 N.J. 596, 622, 569 A.2d 1314 (1990); State v. Hartley, 103 N.J. at 283, 511 A.2d 80; (2) the presence of intervening circumstances, State v. Casimono, 250 N.J.Super. at 183, 593 A.2d 827; and (3) the temporal proximity between the illegal conduct and the challenged evidence, State v. Johnson, 118 N.J. at 653, 573 A.2d 909. Ultimately, the determination whether the evidence is tainted because it is the product of the exploitation of the police illegality is a factual matter to be resolved by the court. Ibid.
We first consider whether the police misconduct was flagrant. Detective Hennessy clearly went wide of the mark when he repeatedly ignored defendant's requests for an attorney. The right to counsel constitutes a vital ingredient of due process, tracing its paternity to the landmark case of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The constitutional guaranty recognizes the obvious but important truth that the average defendant does not have the professional legal skill to protect himself when questioned in the inherently coercive atmosphere of the station house. By failing to comply with defendant's requests for a lawyer, the officer denied him a fundamental right that ranks high in the constellation of constitutional values. Without diminishing or excusing this constitutional infringement, we would nevertheless be remiss were we to ignore the officer's beneficent motive in disregarding defendant's requests and continuing the interrogation. In a kaleidoscopic *440 situation pregnant with the risk of catastrophe, where spontaneity rather than abstract reasoning is likely to prevail, we would perhaps expect too much were we to demand that police officers act as constitutional lawyers. We stress that the detective's purpose was not merely to "catch" a criminal, but rather to save a population from imminent peril. Undoubtedly, most police officers, if placed in Detective Hennessy's position, would act out of a host of different, instinctive, and largely unverifiable motives. But the law would be less than reasonable were it not to recognize the public safety concerns confronting the police in this case. See State v. Wright, 213 N.J.Super. 291, 295-96, 517 A.2d 171 (App.Div.1986).
We next consider whether Mrs. Pante's consent to search and its aftermath constituted independent intervening circumstances sufficient to dissipate the taint of the primary illegality. Our effort is to "mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." United States v. Leon, 468 U.S. 897, 911, 104 S.Ct. 3405, 3414, 82 L.Ed.2d 677, 691 (1984) (quoting Brown v. Illinois, 422 U.S. at 609, 95 S.Ct. at 2264, 45 L.Ed.2d at 430); see also Nix v. Williams, 467 U.S. 431, 441-43, 104 S.Ct. 2501, 2507-08, 81 L.Ed.2d 377, 386-90 (1984); State v. Sugar III, 108 N.J. 151, 156-57, 527 A.2d 1377 (1987). At the outset, we note that the record is ambiguous concerning whether defendant's statement to Detective Hennessy that additional explosives were stored at his residence was directly communicated to the Mansfield Police Department. It is perhaps arguable that the decision to investigate the Mansfield address was thus the direct product of defendant's illegally obtained statement. To put the matter at rest, we are entirely satisfied that even absent defendant's statement, the police would have focused their investigation upon the possibility that defendant possessed additional explosives at his home. Stated some what differently, the record contains "clear and convincing evidence that had the illegality not occurred, [the police] would have pursued established investigatory procedures that would have inevitably resulted" in the investigation of defendant's residence. State v. Sugar II, 100 N.J. 214, 240, 495 A.2d 90 (1985). The State's heavy burden of proof did not serve to foist upon the trial court a naivete wholly unanchored in human logic and experience.
The next question is whether Mrs. Pante's consent to search her home was voluntary. Consent is a factual question to be determined from the relevant circumstances. State v. Koedatich, 112 N.J. 225, 264, 548 A.2d 939 (1988). We are persuaded by the totality of the circumstances that Mrs. Pante voluntarily consented to the search of her home. The record contains substantial credible evidence supporting the trial court's factual finding in that respect. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). In reaching this conclusion, we recognize that the trial court never made a specific finding as to whether Mrs. Pante was informed of the fact that defendant had signed a consent to search form. Suffice it to say, even if this fact was conveyed to Mrs. Pante, we are satisfied that her permission to search was grounded in other considerations, such as her concern for her neighbors. Further, the fact that the police told Mrs. Pante they would obtain a warrant if she refused to consent does not alter our conclusion. A search cannot be justified on the basis of consent when the consent has been given only after the police assert that they possess a warrant. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797, 802 (1968); State v. Dolly, 255 N.J.Super. 278, 285-86, 605 A.2d 238 (App.Div.1991); State v. Laduca, 89 N.J.Super. 159, 166, 214 A.2d 423 (App.Div.1965); LaFave, Search and Seizure, § 8.2(a) at 176 (1981). But here, it cannot be said that Mrs. Pante merely acquiesced to a claim of lawful *441 authority. The State sustained its burden of proving that the consent was voluntary and was made with knowledge of the right to refuse. State v. Johnson, 68 N.J. 349, 354, 346 A.2d 66 (1975); see Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973).
Defendant contends that his mother did not have the right to permit the police to search his room. A valid consent may be obtained from one other than the accused. State v. Suazo, 133 N.J. 315, 320, 627 A.2d 1074 (1993). A third person who possesses "`common authority over or other sufficient relationship' to the property sought to be inspected may consent to its search." Ibid. (quoting United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974)). The authority to consent may arise from the "`mutual use of the property by persons generally having joint access or control for most purposes.'" Ibid. However, a third person's consent is invalid with respect to property within the exclusive control of another. Ibid. A protected expectation of privacy may exist where a defendant has taken some special steps to protect his personal effects from the scrutiny of others. State v. Douglas, 204 N.J.Super. 265, 278, 498 A.2d 364 (App. Div.1985).
New Jersey is "among the overwhelming majority of [jurisdictions] holding that a parent has the right to consent to the search of the property of his or her son or daughter." State v. Crumb, 307 N.J.Super. 204, 243, 704 A.2d 952 (App.Div.1997); State in the Interest of C.S., 245 N.J.Super. 46, 49, 583 A.2d 785 (App.Div.1990). Even in cases in which the parents' offspring has reached adulthood, "courts have been reluctant to find that the son or daughter had exclusive possession of a room in the parent's home." State v. Crumb, 307 N.J.Super. at 244, 704 A.2d 952. Moreover, "if a law-enforcement officer at the time of the search erroneously, but reasonably, believed that a third party possessed common authority over the property to be searched, a warrantless search based on that third party's consent is permissible under the Fourth Amendment." State v. Suazo, 133 N.J. at 320, 627 A.2d 1074; see State v. Maristany, 133 N.J. 299, 306, 627 A.2d 1066 (1993). In Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), for example, a defendant's former "live-in" girlfriend, who had retained a key to the premises, admitted the police, although she had no common authority to do so. The United States Supreme Court held that for an apparently consensual search to pass federal constitutional muster, a police officer conducting the search need not be factually correct, but only reasonable in the belief that consent was given. Id. at 189, 110 S.Ct. at 2801, 111 L.Ed..2d at 161.
Within this analytical framework, we are inclined to the view that the police could reasonably have believed Mrs. Pante had the right to consent to the search of defendant's bedroom even if, as the defense urges, she had no common authority over the property. Retention of the key to the bedroom was strong evidence that Mrs. Pante had the right to consent. The fact that she gave defendant "his privacy" does not necessarily militate against that conclusion. More troublesome is the question whether Mrs. Pante had real or apparent authority to consent to the search of defendant's personal items, such as the closed duffel bag and the file cabinet. "A third party who has common authority over the premises might nevertheless lack common authority over [personal] items." State v. Coyle, 119 N.J. at 217, 574 A.2d 951 (citing United States v. Poole, 307 F.Supp. 1185 (E.D.La.1969)); State v. Johnson, 85 N.M. 465, 513 P.2d 399 (1973); White, "The Fourth Amendment as a Way of Talking About People: A Study of Robinson and Matlock," 1974 Sup.Ct. Rev. 165, 226; see also United States v. Padron, 657 F.Supp. 840, 847 (D.Del.1987), aff'd sub nom. United States v. Rubio, 857 F.2d 1466 (3d Cir.), cert. denied, 488 U.S. 974, 109 S.Ct. 512, 102 L.Ed.2d 547 (1988); *442 Ledda v. State, 564 A.2d 1125, 1129 (Del. 1989); but see United States v. Anderson, 859 F.2d 1171, 1176-77 (3d Cir.1988); United States v. Varona-Algos, 819 F.2d 81, 83 (5th Cir.), cert. denied, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 255 (1987).
We need not dwell upon these issues. As the owner of the residence, Mrs. Pante had the right to permit the police to enter. Even were we to assume that defendant had a reasonable expectation of privacy with respect to his locked bedroom, that expectation did not extend to the unlocked hallway that led to his living quarters. It will be recalled that blasting and demolition materials were observed strewn about the floor of the hallway. Based upon that observation, the police believed that it was certain that additional explosives were stored in defendant's bedroom. The officers were responding to a grave emergency and they had the right to be in the hallway when they observed these materials. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1645-46, 18 L.Ed.2d 782, 787 (1967). The search of defendant's bedroom and his personal items was thus justified by a public safety exigency. Because independent, intervening circumstances made time of the essence, the temporal proximity of the search and the illegally obtained statement is of no consequence. The search was not tainted by the earlier failure of the police to scrupulously honor defendant's right to an attorney.

III.
Defendant's argument that his sentence is excessive is clearly without merit. R. 2:11-3(e)(2).
Affirmed.