**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1197-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

CARLOS VILLARREAL[1],

    Defendant-Respondent.

_____

Argued May 24, 2021 – Decided July 12, 2021

Before Judges Currier and Gooden Brown.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-05-0743.

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

---

[1] Defendant's name was incorrectly spelled on the Order on appeal as Villareal.

Keith G. Oliver argued the cause for respondent (Law Offices of Proetta, Oliver & Fay, attorneys; Jeff Thakker, of counsel; Keith G. Oliver, on the brief).

PER CURIAM

By leave granted, the State appeals from the November 13, 2020 Law Division order granting defendant's motion to suppress evidence seized as the fruits of an unlawful interrogation conducted in violation of Miranda v. Arizona, 384 U.S. 436 (1966). We affirm.

I.

On May 15, 2019, defendant was charged in a nine-count indictment with two counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts one and two); two counts of second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b)(1) (counts three and four); fourth-degree possession of hollow nose bullets, N.J.S.A. 2C:39-3(f) (count five); third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count six); two counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-3(e) and N.J.S.A. 2C:39-5(d) (counts seven and eight, respectively); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2) (count nine).

The charges stemmed from the seizure of various weapons and ammunition from defendant's vehicle after he transported a friend and their

2

children from out-of-state to pick up the friend's minor daughter from the child's biological father pursuant to a custody agreement. Police were called to the scene of the custody exchange by the biological father, who reported that defendant had threatened to shoot him during a FaceTime call two days prior. Police later obtained a search warrant for defendant's vehicle after defendant disclosed during questioning at the scene that there were weapons inside the vehicle. During the entire encounter, police never gave defendant Miranda warnings and continued to question defendant notwithstanding his repeated invocation of his right to remain silent and his right to counsel.

Pre-trial, defendant moved to suppress "all evidence seized" from his vehicle "on the grounds that it was the fruits of an unlawful interrogation, in violation of [Miranda.]" At a suppression hearing conducted on August 28, 2020, the State produced a single witness, Patrol Sergeant Ian[2] James, a ten-year veteran of the Lakehurst Township Police Department. The State also introduced various exhibits, including James' body cam footage which recorded the entire encounter.

James testified that at approximately 1:03 p.m. on October 20, 2018, he responded to an apartment complex in the township. James was dispatched to

---

[2] Ian alternately appears as Iain in the record.

the location because someone at that address called 911 to report that "somebody . . . was going to shoot them."  Given "the nature of the call," another Lakehurst police officer as well as officers from Manchester Police Department were also dispatched to the location.

James was the first officer to arrive, and, upon arrival, observed a black Mitsubishi "SUV-type vehicle" with "an Indiana license plate" "parked in front of" the dispatched address with two women "standing behind the vehicle."  The women, later identified as Angelica Tello-Cano and her sixteen-year-old daughter, explained that they drove from North Carolina to pick up Tello-Cano's two-year-old daughter from Edward Clark at his residence in the complex pursuant to "a custody agreement."  When asked by James, the women denied "any threats to anybody or threats made specifically involving a gun."

At that point, James returned to his vehicle and informed the other Lakehurst police officer of his location.  James also instructed dispatch to tell Manchester police that their presence was not needed as it appeared "to be a child custody dispute."  Despite James' instructions, Manchester police officers still arrived at the location, resulting in a total of six police officers, including James, at the scene.

A-1197-20

Once the other officers arrived, James approached the residence to investigate further. While "passing [the Mitsubishi]," James "observed a male" later identified as defendant "sitting in the driver's seat of that vehicle." Three children were seated in the rear of defendant's vehicle. James asked defendant "why he was [t]here" and defendant responded that he drove with Tello-Cano from North Carolina to pick up her daughter. When asked by James whether "there [were] any reported threats . . . made to him or to anybody else" involving weapons, defendant "stated no."

During this exchange, defendant handed James "his identification" and a "U.S. Law Shield Firearms Program Member" card containing a purported membership number on the front of the card. The back of the card read as follows:

> To Any Law Enforcement Officers,
>
> The holder of this card invokes their rights pursuant to the 4th, 5th, [and] 6th Amendments to the U.S. Constitution, all applicable provisions of the State Constitution, and all applicable provisions of the State Codes [and] Statutes. Any questioning of this individual must be immediately suspended and shall be continued only in the presence of and with the advice of legal counsel.

A-1197-20

James testified that he "only saw the front of the card" and did not "remember looking at the back." James also stated that he "did not ask" defendant for either of these credentials and defendant simply "provided them" to him.

After talking to defendant, James and another officer went inside the residence to speak to Clark, who confirmed that Tello-Cano was there to pick up their daughter pursuant to a "child custody agreement." While Clark did not object to the custody exchange, he explained that there had been a series of "vulgar," "nasty," and "harass[ing]" exchanges between the parties. Specifically, Clark told James that two days prior, while he was on a FaceTime call with Tello-Cano, defendant "came into the frame and told . . . Clark that . . . when he came to New Jersey, he was going to shoot him." According to Clark, "his adult son . . . witnessed the [threat]." James briefly conferred with Clark's son who corroborated his father's account. Although Clark did not see a gun, he told James that he called the police to ensure a peaceful exchange of his child to Tello-Cano because Clark's "lawyer" had told him that defendant "ha[d] priors . . . for pointing loaded weapons at people."

After speaking to Clark, James exited the residence, returned to the Mitsubishi where defendant was still seated, and asked defendant if there were any firearms in the vehicle. Defendant replied that he did not have any firearms

6

in the vehicle, that he "wanted to remain silent," and "wanted to speak to a lawyer." James persisted and "advised [defendant] that due to the concern that there was a firearm . . . readily available," James "needed to know" for officer and public "safety." When James referred to the "US Law Shield Firearm Member [card]" that defendant had given him, defendant reiterated that he wished to invoke his right to remain silent and that he wished to speak to a lawyer before answering any questions.

According to James, at that juncture, "[defendant] was detained" and was not free to leave. Defendant's vehicle was surrounded by four officers – one standing on the passenger side of the vehicle and three located at various points on the driver's side of the vehicle. Additionally, the officers' vehicles blocked defendant's vehicle from leaving.

After James warned that he would "impound [defendant's] car and get a warrant," defendant informed James he had "a [locked] lockbox in the back of the car" which presumably contained a firearm. James asked defendant "if he would be willing to show [him] where the lockbox was and he said he would." When defendant exited the vehicle, he was not frisked for weapons. Defendant then proceeded to open the cargo area of his vehicle and pointed to the lockbox

7

as instructed by James. The lockbox was located "behind the third seat area," and "had Sergeant Villarreal written on it."[3]

Because James was unable to see inside, he asked defendant whether the weapon inside the lockbox was loaded and "[defendant] indicated that it was." James then explained to defendant that he had been called to the location on "a report of somebody trying to shoot somebody" and asked defendant whether there were additional weapons in the vehicle. Initially, defendant responded that "his sons ha[d] knives" and he had "a loose knife somewhere." When James specifically asked whether there were other firearms in the vehicle, defendant replied "there was a gun . . . possibly in the air filter or . . . the glove box."

Following this disclosure, the children were removed from the vehicle and defendant was frisked for weapons with negative results. James then asked defendant for "consent to search the vehicle," and explained to defendant that he had "the right to refuse," "the right to be present [during the search,]" and "the right to stop the search at any time." James also informed defendant that if he did not consent to the search, he would obtain a search warrant. In response, defendant "asked if he could speak with his lawyer" before giving an answer, to which James agreed. Once defendant reached his lawyer on the telephone and

---

[3] Defendant told James he was "retired [military]."

8

"put [him] on speakerphone," defendant's lawyer "told [James] that [defendant] was not giving consent and . . . was not answering any further questions."[4] Defendant also reiterated that he was not answering any more questions.

James proceeded to secure the lockbox, arranged for the vehicle to be impounded and towed, and transported defendant along with his vehicle to police headquarters where he remained while James applied for a search warrant. After the search warrant was issued, a search of defendant's vehicle revealed a handgun in the "glove box," which was unlocked. There was "a loaded magazine inside the handgun" and "a round in the chamber." Inside the lockbox, James found "another handgun" with "a fully loaded magazine inside the handgun" and "a round loaded in the chamber." James testified that some of the rounds that were recovered were hollow-point bullets. James also located "a switchblade knife" in the "[c]enter console." After the weapons and ammunition were confiscated, defendant was arrested and charged accordingly. James acknowledged that prior to being formally arrested, defendant was not advised of his Miranda rights at any point during the encounter.

---

[4] In response to the lawyer's inquiry, James stated that defendant was "not under arrest" but was "being detained for investigation" of "threatening to shoot somebody."

Following the hearing, on October 27, 2020, the motion judge conducted oral argument, after which he granted defendant's motion. Initially, in an oral decision, the judge found James' testimony "to be credible" and corroborated by the body cam footage upon which the judge heavily relied. The judge concluded that "the situation was clearly custodial," triggering Fifth Amendment rights and privileges, and that defendant invoked his rights. In a written decision accompanying an order entered on November 13, 2020, the judge made factual findings and explained his reasons for concluding that defendant was in a custodial setting as follows:

> [A]t least six uniformed police officers were on the scene in the immediate vicinity of [d]efendant's SUV. The officers were arranged in a strategic fashion standing on all sides of [d]efendant's vehicle, thereby establishing a physical perimeter around [d]efendant and his SUV. In addition to the officers on foot surrounding [d]efendant's SUV, at least three of the responding officer's patrol vehicles were parked in a manner which limited egress from the parking lot. In short, any reasonable person would have drawn the conclusion that he or she was not free to leave the scene. Based on these objective circumstances, this court finds that [d]efendant was subject to a significant deprivation of his freedom of action, thus, he was in custody. See State v. P.Z., 152 N.J. 86, 103 (1997). As such, Miranda warnings were required before any questioning by law enforcement. And yet it is uncontested that [d]efendant was not Mirandized at any point in time on this date.

Turning to defendant's invocation of his rights, the judge found that "[d]efendant's tender of a 'U.S. Law Shield Firearm Member [c]ard' . . . did not rise to the level of an invocation of any constitutional rights."[5]  However, the judge determined "that [d]efendant did invoke his Fifth Amendment rights on at least three occasions."  The judge found that defendant expressly invoked his "right to remain silent" and his "right to seek the assistance of counsel," but "James continued questioning [d]efendant after invocation of these rights" during the following exchanges:

> James:  Is there any firearms in the car at all?
>
> Defendant:  No.  I will talk to a lawyer first, I mean no.
>
> James:  What's that?
>
> Defendant:  I said I have my rights; I don't want to say anything.
>
> James:  Well, um, you are giving me this US Law Shield Firearm Member.
>
> Defendant:  Well that is why I said, if I need to speak to a lawyer I will first.

---

[5]  Despite crediting James' testimony that he only observed the front of the card and not the back, the judge explained that even if James had reviewed the back of the card, its contents did not, "in fact," constitute "an express invocation of a Fifth Amendment privilege against self-incrimination or request to seek the assistance of counsel."

11

James: Well . . . I need to know if there are any weapons in the car because if I am concerned there are weapons in the car for my safety - and the safety, I will impound your car and get a warrant.

Defendant: I . . . have a lockbox.

James: You have a lockbox, OK is it locked in the car?

Defendant: Yes

James: OK would you mind showing me, so I make sure I'm OK?

After concluding that "[d]efendant was not <u>Mirandized</u>" and had "invoked his constitutional rights" but that "James continued, without pause, to question [him]," the judge rejected the State's contention that the questioning fell within the purview of the public safety exception to <u>Miranda</u>. Instead, the judge determined that "the need to protect the police or the public [did] not justify James' continued questioning of [d]efendant after invocation."

In that regard, relying on <u>New York v. Quarles</u>, 467 U.S. 649 (1984), the judge explained:

> In this case, James' initial questioning about the presence of a firearm was supported by [d]efendant tendering the U.S. Law Shield Firearm Member [c]ard . . . . The victim herein alleged that[:] several days prior, during a [FaceTime] call, [d]efendant had threatened to shoot him, and that [d]efendant had prior firearms charges. However, these facts do not present the type of "kaleidoscopic situation" contemplated in

12

Quarles, [467 U.S. at 656-57,] such that spontaneity rather than adherence to a police manual justified an infringement of [d]efendant's rights.

Here, unlike in Quarles, the officers did not face an immediate need to locate the gun. The alleged threat had been made several days prior, thus no immediacy to act on the part of law enforcement. There was no indication that a firearm had been abandoned or discarded in a public location. Defendant did not attempt to flee the scene or demonstrate any aggression or volatility in any way towards the police or anyone else present. The threat of any immediate danger related to the presence of firearms was addressed immediately, at least arguably, when police first arrived on scene. Their questioning of the individuals present outside the vehicle as to threats of any sort were answered in the negative. The absence of any immediate threat to police or public safety is readily evident from the fact that James characterized the situation as "a child custody dispute." James did so when he called off backup from the Manchester Township Police Department.

Next, analogizing the facts to those in State v. Stephenson, 350 N.J. Super. 517, 525 (App. Div. 2002), the judge stated:

As in Stephenson, the alleged threat was specific to the victim and not to the public at large or the police and it was remote in time as it took place several days prior. Equally important in this case is that the alleged victim never observed a gun.

As in Stephenson, James indicated that if [d]efendant didn't answer his questions, he would obtain a warrant. In response to [d]efendant's invocation of his right to consult with a lawyer and to

13

refuse to answer any further questions, James advised
[d]efendant that he could impound his vehicle and get
a warrant. Assuming that James believed there was
probable cause for a warrant application, the State had
that option, but chose to ignore it.

The judge concluded that the "continued questioning by law enforcement under the circumstances was constitutionally non-compliant and the fruits of that subsequent search must be suppressed."

II.

In this ensuing appeal, the State raises the following points for our consideration:

POINT I:  THE COURT ERRED BY FAILING TO PROPERLY APPLY THE PUBLIC SAFETY EXCEPTION TO PERMIT THE OFFICER TO QUESTION THE DEFENDANT SOLELY TO DETERMINE THE PRESENCE OF ANY FIREARMS FOR THE SAFETY OF THE OFFICERS AND OTHERS AT THE SCENE AND IN THE VEHICLE

POINT II: THE COURT ERRED IN FINDING THAT THE DEFENDANT WAS "IN CUSTODY" FOR PURPOSES OF MIRANDA.

When we review a trial court's decision on a suppression motion, "we generally defer to the factual findings of the motion court when they are supported by credible evidence in the record." State v. Sims, 466 N.J. Super.

14

346, 362 (App. Div. 2021). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "Deference to a trial court's factual findings is appropriate 'because the trial court has the "opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy."'" Sims, 466 N.J. Super. at 362-63 (quoting State v. S.S., 229 N.J. 360, 374 (2017)). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." State v. Tillery, 238 N.J. 293, 314 (2019) (citing S.S., 229 N.J. at 380-81). However, "[t]o the extent that a trial court determination involved legal conclusions, we review those conclusions de novo." Ibid.

Turning to the governing principles of constitutional law pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically

triggering the Fifth Amendment privilege against self-incrimination." P.Z., 152 N.J. at 102 (citing Miranda, 384 U.S. 436).  As a result, "when a person in police custody is questioned by law enforcement, he must be told that he has the right to remain silent, that any statement he makes may be used against him, that he has the right to an attorney, and that if he cannot afford an attorney, one will be provided for him."  Ibid. (citing Miranda, 384 U.S. at 444).  These procedural safeguards, commonly referred to as "Miranda warnings," ibid., are intended "to secure the privilege against self-incrimination" and are required whenever custodial interrogation occurs.  Miranda, 384 U.S. at 444.

Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Ibid.  "Thus, the protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation."  State v. Hubbard, 222 N.J. 249, 266 (2015).  While federal law requires a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," California v. Beheler,  463 U.S. 1121, 1125 (1983) (internal quotation marks omitted), "[o]ur courts have also recognized that custody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs,

and may occur in a suspect's home or a public place other than a police station." P.Z., 152 N.J. at 102-03 (internal quotation marks omitted).

"Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernable." State v. Scott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on 'how a reasonable [person] in the suspect's position would have understood his situation,'" rather than "'on the subjective views harbored by either the interrogating officers or the person being questioned[.]'" Hubbard, 222 N.J. at 267 (first alteration in original) (first quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)); and then quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Indeed, "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103. See State v. Smith, 374 N.J. Super. 425, 431 (App. Div. 2005) (delineating relevant factors in evaluating custody as "the time, place and duration of the detention; the physical surroundings; the nature and degree of the pressure applied to detain the individual; language used by the officer; and objective indications that the person questioned is a suspect").

"The public safety exception to the requirement of giving a <u>Miranda</u> warning prior to interrogation was first recognized by the United States Supreme Court in [<u>Quarles</u>]." <u>State v. Melendez</u>, 423 N.J. Super. 1, 23 (App. Div. 2011) (citing <u>Quarles</u>, 467 U.S. at 649). The core principle supporting the public safety exception is that the exigency of a threat to safety outweighs the need for the "prophylactic" benefit of <u>Miranda</u>. <u>Quarles</u>, 467 U.S. at 657. Thus, "[t]his exception allows police to question an accused, prior to giving <u>Miranda</u> warnings, when there is a public safety concern." <u>Melendez</u>, 423 N.J. Super. at 23 (citing <u>Quarles</u>, 467 U.S. at 657).

> Our Supreme Court adopted the public safety exception in <u>State v. O'Neal</u> holding that the questioning of a suspect prior to the administration of <u>Miranda</u> warnings was acceptable when the situations presented an "objectively reasonable need to protect the police or the public from any immediate danger associated" with a weapon.
>
> [<u>Ibid.</u> (quoting <u>State v. O'Neal</u>, 190 N.J. 601, 618 (2007)).]

In <u>Stephenson</u>, we delineated a framework to determine whether the public safety exception applied to a given situation, explaining:

> There must be a compelling and exigent need, under the totality of the circumstances, to protect the police or the public. In order to establish the need to invoke the exception, the State must generally demonstrate "(1) there was an objectively reasonable need to protect the

18

police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety."

[350 N.J. Super. at 525 (quoting State v. Prim, 730 N.E.2d 455, 463 (8th Dist. 1999).]

We warned that "the exception should be narrowly construed" because "[t]o sanction unwarned questioning about the presence or whereabouts of a gun in every case where a gun is suspected would result in the exception swallowing the rule." Ibid. We acknowledged that while "[t]he discarded gun in Quarles was reasonably believed to be in a public place," the Quarles Court's "rationale [did] not require this factor." Stephenson, 350 N.J. Super. at 527. Instead, "[t]he Quarles Court fashioned the exception to deal with 'a kaleidoscopic situation . . . where spontaneity rather than adherence to a police manual is necessarily the order of the day,' where it is necessary for the police to 'neutralize the volatile situation confronting them.'" Stephenson, 350 N.J. Super. at 528 (quoting Quarles, 467 U.S. at 656, 658).

We explained:

In the totality of any particular set of circumstances, a missing gun in a private location, such as a home, apartment or motel room might pose the requisite danger to the police or public to justify the exception. However, to the extent that public safety is implicated, the gun must be reasonably believed to be in an

19

unknown location (even if private) which is accessible to third parties and not reasonably capable of being secured. It is the overall circumstances, not merely the location, therefore, that controls.

[Id. at 527-28.]

Applying those principles, the Stephenson court rejected the State's reliance on the public safety exception where police responded to a call from a woman claiming that her son had an argument on the telephone with someone who threatened to shoot him. 350 N.J. Super. at 520. After the call was traced to a motel, where the victim identified the defendant and corroborated the threat, police found the defendant alone in his motel room. Ibid. When asked by an officer "if he had any weapons," the defendant responded "[n]ot on me." Id. at 521. After frisking the defendant "with negative results," the officer asked where the gun was, and handcuffed the defendant when he did not provide a verbal response because the defendant "was increasingly nervous" and looking at the exits "as if possibly looking for a way to flee." Ibid.

Without advising the defendant of his Miranda rights, the officer then told the defendant that if he did not cooperate and tell him where the gun was, he would obtain a search warrant for the room. Ibid. Eventually, the defendant "gestured with his head towards the dresser," "stated the gun was in the drawer

in a blue bag," and "[w]hen asked" described the gun to police. Ibid. The police found the firearm exactly as described by the defendant. Ibid. We concluded:

> The factual complex before us does not support a finding of a volatile situation contemplated by Quarles which required immediate police inquiry to defuse a potential threat to the public safety. Once defendant was handcuffed, . . . there was no basis to find an immediate danger to the police, and the record contains no evidence of any immediate danger to the public. We therefore hold that under these circumstances the public safety exception does not apply.
>
> [Id. at 530.]

If Miranda warnings are required, "under New Jersey law [a suspect's] 'request, "however ambiguous," to terminate questioning' would have been sufficient to trigger his right to remain silent." P.Z., 152 N.J. at 105 (quoting State v. Hartley, 103 N.J. 252, 263 (1986)). "Likewise, [a suspect's] invocation of the right to counsel 'need not [have been] articulate, clear, or explicit . . . ; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel.'" Ibid. (second and third alteration in original) (quoting State v. Reed, 133 N.J. 237, 253 (1993)).

If the suspect invokes his right to remain silent or seek counsel,

> the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries

21

> until he has consulted with an attorney and thereafter consents to be questioned.
>
> [Miranda, 384 U.S. at 445.]

Thus, "police are constitutionally required to scrupulously honor a defendant's request to terminate questioning or to have counsel present during interrogation" and "[o]nce it has been determined that there has been a failure to honor the previously invoked right, the resultant violation is a constitutional infringement requiring suppression of the defendant's statement." State v. Pante, 325 N.J. Super. 336, 346 (App. Div. 1999).

With these principles in mind, we must determine whether defendant was in custody or deprived of his freedom of action in a significant way to trigger Miranda warnings, whether the public safety exception applied, and, if not, the consequences of law enforcement's failure to provide Miranda warnings and honor defendant's invocation of his rights.

First, based on the judge's factual findings which are amply supported by the credible evidence in the record, we are satisfied that the objective circumstances demonstrate that defendant was in police custody when he was questioned about the presence of firearms in his vehicle. Once defendant tendered to James a U.S. Law Shield Firearm Member card, and James was advised by Clark that defendant had threatened to shoot him upon his arrival in

22

New Jersey, that Clark's adult son had witnessed the threat, and that Clark's lawyer had confirmed the plausibility of the threat, even James acknowledged that defendant was detained for investigation. Significantly, the police-dominated atmosphere and the positioning of the police officers and police vehicles confirmed that defendant was deprived of his freedom of action in a significant way and was not free to leave. There can be no doubt that a reasonable person in defendant's position would have understood the objective circumstances presented as a de facto arrest.

The State asserts that because "defendant was not handcuffed, nor . . . placed in the rear of a patrol vehicle," and was not subjected to coercive or prolonged questioning, he "was not in custody" under "the totality of the circumstances." However, none of these elements are required to meet the requirements of "custody" or "depriv[ation] of . . . freedom of action in a significant way" for purposes of establishing "custody in the Miranda sense . . . ." State v. Godfrey, 131 N.J. Super. 168, 175 (App. Div. 1974). Indeed, "the inherent pressures of the interrogation atmosphere" as well as the "police-dominated atmosphere" present here were among "the methods of police investigation" that impelled the Miranda Court to require the administration of the Miranda warnings. Godfrey, 131 N.J. Super. at 177.

The State also argues that because "James had a reasonable and articulable suspicion that there may be weapons unlawfully in the vehicle, . . . any alleged seizure of the defendant was nothing more than an investigative detention."  To be sure, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated."  Hubbard, 222 N.J. at 266 (alteration in original) (quoting State v. Timmendequas, 161 N.J. 515, 614-15 (1999)); see also Smith, 374 N.J. Super. at 428 ("We conclude that a police officer may question those present without giving Miranda warnings, so long as the inquiries are reasonably related to confirming or dispelling suspicion and those questioned are not restrained to a degree associated with formal arrest.").  However, here, defendant was clearly a suspect subjected to a de facto arrest, implicating Miranda.

Second, the totality of the circumstances supports the judge's finding that the public safety exception did not apply.  Like Stephenson, "[t]he situation did not manifest a danger to the public" because there was no basis for the police to believe that, if defendant possessed a gun at all, it was anywhere other than on his person or in his vehicle, which was neither a public place nor accessible to the public.  350 N.J. Super at 528.  Contrary to the State's contention, any concern "for the safety of the officers" or the protection of the children could

24

have been immediately addressed by frisking defendant and removing the children from the vehicle, both of which ultimately occurred. Further, with the police presence and the ability to impound the vehicle while a search warrant was sought, Clark, the intended victim of the threat "was in no immediate danger from defendant." Ibid.

Moreover, as in Stephenson, "a gun was not actually observed . . . and the circumstances of the threat were remote in time and place rather than immediate[,]" id. at 524, as was the case in Quarles, 467 U.S. at 657 (applying the public safety exception where police asked where the gun was without administering Miranda warnings in the course of apprehending a suspect in a supermarket who had just been accused of raping a woman at gunpoint and was wearing an empty gun holster). See also State in Interest of A.S., 227 N.J. Super. 541, 543-44 (App.Div.1988) (applying the public safety exception where police asked about the whereabouts of the gun without administering Miranda warnings in the course of apprehending a suspect in a residential neighborhood who had just been seen firing a gun on the street and had a negative pat search). As we stated in State v. Elkwisni, 384 N.J. Super. 351, 370 (App. Div. 2006), to apply the public safety exception "to these facts subverts the constitutional protections embodied in Miranda and opens the door to the pretextual invocation of 'public

25

safety' whenever the police are not immediately able to recover weapons used in the commission of a crime."

Finally, because police subjected defendant to unwarned questioning in violation of his Fifth Amendment right and failed to honor his repeated invocation of his rights, defendant's statements about the presence of weapons in his vehicle must be suppressed. Likewise, the physical evidence seized from defendant's vehicle due to defendant's incriminating statements which were incorporated into the search warrant affidavit must be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488 (1963); see State v. Parisi, 181 N.J. Super. 117, 119 (App. Div. 1981) ("[A] search warrant based on illegally obtained information is itself tainted and all evidence seized pursuant to it must be suppressed.").

"[T]he remedy for a violation of a defendant's Fifth Amendment right is the exclusion of the statement so obtained." Pante, 325 N.J. Super. at 346. "The exclusionary prohibition extends as well to the indirect as well as the direct products of the constitutional invasion." Ibid. (citing Wong Sun, 371 U.S. at 484). The State makes no argument that law enforcement "obtained the [physical] evidence by means that are sufficiently independent to dissipate the

26

taint of their illegal conduct."  Id. at 347 (citing State v. Johnson, 118 N.J. 639, 653 (1990)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1197-20